THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EFRAIN GARCIA, Defendant-Appellant.

First District (5th Division)   No. 77-1901

Opinion filed September 29, 1978.—Rehearing denied October 26, 1978.

Leo E. Holt, of Harvey, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Kenneth L. Gillis, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was convicted of murder and sentenced to 30 to 90 years imprisonment. On appeal the following issues are presented: whether the trial court erred in denying his motion to quash the indictment and for a discharge; and whether he was denied a fair trial by (a) prosecutorial argument and (b) the ineffectiveness of his counsel.

It is undisputed that at approximately 11 p.m. on a November evening a passing motorist noticed a body, later identified as Donald Taylor, lying on a grassy parkway along a main thoroughfare. The police were summoned and found Donald lying dead in a pool of blood from a gunshot to the back of his head and stripped to the waist with his clothing in a pile beside him.

Earlier that day Donald had visited his wife, Michelle, and his newborn daughter in the hospital and then at 7 p.m. he went to the home of his father-in-law, James Genaro. Later they went to a tavern to play pool and, upon their return to the Genaro home at 10 p.m., they entered through the back door and remained in the kitchen playing poker. Genaro said he heard the television located in the living room but neither of them determined who was in that room. During the card game Donald expressed his happiness over the birth of his daughter. At approximately 10:30 Donald left using the rear exit.

Meanwhile, at about 9:30 that evening defendant had come to the Genaro home looking for his brother, Miguel, who was married to Michelle's sister Anna and who lived in an apartment below Genaro.[1] He accepted an invitation from Michelle's brother, Anthony, to wait for Miguel.

At trial Anthony testified that a week prior to the incident in question defendant had expressed his love for Michelle and his desire to marry her. In Anthony's opinion defendant's feeling for Michelle was the cause of bad blood between Donald and himself. Anthony further testified that on the night in question as he, Anna, and defendant were watching television, he heard Donald, who was in the kitchen, expressing his joy over the birth of his daughter. In an apparent reply defendant mumbled

---

[1] Neither Anna nor Miguel testified.

unintelligibly and then made a threat to "get" Donald. Later when Donald left through the rear door defendant rose and walked toward the front door. Anthony inquired as to where he was going and he replied that he was going to talk to Donald. Anthony left with defendant and within a couple of blocks they approached Donald from behind. Anthony was ahead of defendant and called out to Donald who turned. Upon seeing defendant Donald took off his shirt and jacket and told defendant that he was not afraid of him. Defendant then positioned himself behind Donald, pulled a handgun from his waistband, and holding the weapon within 6 to 12 inches of the back of Donald's head fired once. As Donald fell to the ground defendant called Anthony's attention to a gasoline station attendant who was observing them. While they were running from the scene, defendant said he was sorry and that he had not intended to shoot Donald.

To the contrary, defendant testified that when he, Anna, and Anthony were viewing television in the living room, he heard no conversation emanating from the kitchen; that he heard the back door slam but did not know who was in the back of the house; that after the door slammed Miguel arrived and joined the group watching television; that no one left the living room until 11:30 when he, Anna, and Miguel went downstairs; that he did not express a desire to marry Michelle whom he had dated two years before but had not seen since that time; that he did not threaten to "get" Donald; that he has never carried a gun; and that he did not shoot Donald.

Defendant was arrested in Puerto Rico and returned to Chicago in May 1975. He testified that shortly after the event in question he flew to Puerto Rico to visit his mother who was ill and that he did not hear of Donald's murder until the time of arrest. Meanwhile Anthony left Chicago for Topeka, Kansas in May 1975. Because he was not available to testify at defendant's preliminary hearing on June 5, 1975, the State requested but was denied a continuance. Evidence of the condition and location of Donald's body and of the cause of his death was presented but defendant was discharged upon a finding of no probable cause. At the conclusion of the hearing defendant's counsel made a demand for trial. Subsequently, Anthony returned to Chicago and testified before the grand jury which indicted defendant for murder on July 7, 1976. Prior to trial defendant moved for discharge on grounds that he was not tried within 160 days of his trial demand. The motion was denied.

During the course of the trial it was brought out that Anthony initially told the police that he knew nothing of Donald's death. Anthony explained that he had known defendant and Miguel for many years and knew that they were Latin Kings. Therefore, motivated by fear of Latin King retaliation should he cooperate with the authorities, he initially

denied knowledge of the crime. Although defendant denied that he and his brother were Latin Kings, he acknowledged that there were many members of that group in the area and that he had gone to school with some of them. During the course of cross-examination Anthony told of a prior act of Latin King retaliation committed by three unidentified members who severely beat Donald because they thought he had reported them to the police.

OPINION

Defendant first contends that the trial court erred in denying his motion to quash the indictment and for a discharge. It is his position that the return of an indictment more than thirteen months after his demand for trial violated his statutory and constitutional right to a speedy trial. We disagree.

■■■ The evil intended to be prevented by the speedy trial provision is wrongful incarceration rather than wrongful accusation as it is based upon the right of the individual to liberty. (*People v. Kidd* (1934), 357 Ill. 133, 191 N.E. 244.) The statutory provisions requiring a person in custody to be tried within 120 days from the date he was taken into custody (Ill. Rev. Stat. 1977, ch. 38, par. 103—5(a)) or a person on bail or recognizance to be tried within 160 days of his demand for trial (Ill. Rev. Stat. 1977, ch. 38, par. 103—5(b)) unless delay is occasioned by defendant, or by circumstances not relevant here, is the legislature's interpretation and implementation of the constitutional requirement for a speedy trial. (*People v. Utterback* (1944), 385 Ill. 239, 52 N.E.2d 775; *People v. Lowe* (1965), 61 Ill. App. 2d 262, 210 N.E.2d 31.) The 160-day period (or 120-day period if defendant is in custody) continues to run should the State nolle pros the charge (*People v. Lee* (1969), 44 Ill. 2d 161, 254 N.E.2d 469; *People v. Fosdick* (1967), 36 Ill. 2d 524, 224 N.E.2d 242), or have the charge stricken with leave to reinstate (see *People v. Baskin* (1967), 38 Ill. 2d 141, 230 N.E.2d 208), but the period is broken and ceases to run if defendant is discharged after a finding of no probable cause unless the State has withheld evidence or otherwise acted in bad faith at the preliminary hearing so as to obtain such a discharge. (*People v. Toney* (1978), 58 Ill. App. 3d 364, 374 N.E.2d 695; *People v. Gimza* (1977), 56 Ill. App. 3d 477, 371 N.E.2d 1135.) The reasoning underlying this distinction was succinctly stated in *Toney*:

> "Where a charge has been stricken with leave to reinstate, the same charge subsequently may be reinstated. After a discharge for want of probable cause, however, the proceedings may begin again only after the State secures additional evidence and files new charges against the defendant. A dismissal for lack of probable cause is a judicial determination in favor of the defendant rather than a

voluntary act on the part of the State. Where charges are dismissed upon a judicial determination of no probable cause, the State has little opportunity to manipulate the proceedings or to purposefully evade the operation of the statutory term. [Citation.]" (58 Ill. App. 3d 364, 368, 374 N.E.2d 695, 698.)

Therefore, absent a showing that the State orchestrated the finding of no probable cause as an evasionary tactic, there is no reason to ignore the statute's requirement that the period runs only when a charge is pending against the accused. As the discharged defendant is at liberty and, in the eyes of the community, exonerated of the charges, the constitutional bases for the speedy trial rule do not dictate a different interpretation. *Toney; Gimza.*

■■ Here, Anthony left the jurisdiction in May 1975—the same month in which defendant was returned to Chicago under arrest. Without Anthony's testimony the State was unable to establish probable cause, which resulted in defendant's discharge on June 5, 1975. Not only has there been no allegation that the State knew of Anthony's whereabouts at the time of the preliminary hearing, but the record reveals that he withheld such information even from his family. Anthony testified that the reason for his departure was fear of Latin King retaliation should he assist the authorities in convicting one of its members. Under the circumstances we find no evasion by the State of the speedy-trial rule. Furthermore, once defendant was discharged on June 5, 1975, his liberty was restored and he was exonerated in the eyes of the community. The subsequent indictment returned on July 7, 1976, was the result of Anthony's testimony which was unavailable to the State at the preliminary hearing. As the statutory period was broken by defendant's discharge and began to run anew upon his postindictment arrest, we see no error in the denial of his motion to quash the indictment and for a discharge.

Defendant next contends that prosecutorial argument and ineffectiveness of counsel denied him a fair trial. First, he complains that references in the argument to the victim's family and to defendant's membership in the Latin Kings deprived him of a fair trial. We cannot agree.

■■ Regarding the parameters of permissible argument it has been said:
" '[I]n the absence of express prohibition, every fact which, in no illegal manner, comes to the knowledge of the jury during the progress of a trial, and which may reasonably influence their judgment is a proper subject of comment in argument.'
* * *
'Statements of counsel and argument based upon facts and circumstances proved, or upon legitimate inference therefrom, do not exceed the bounds of proper debate and are not to be

discountenanced by the courts. [Citation.] It is not improper for the prosecuting attorney to reflect unfavorably on the defendant, or to comment on his actions, if based upon competent and pertinent evidence. [Citations.] Similarly, the State's Attorney has a right to dwell on the evil results of crime and to urge fearless administration of the law.'" (*People v. Castillo* (1976), 40 Ill. App. 3d 413, 424-26, 352 N.E.2d 340, 350-51.)

Ordinarily references to decedent's family (*People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436; *People v. Dukes* (1957), 12 Ill. 2d 334, 146 N.E.2d 14) and defendant's membership in an unpopular organization (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658) are not a proper subject for comment as they usually bear no relevance to the guilt or innocence of the accused and serve only to prejudice the accused. However, where such evidence is relevant and otherwise admissible, it is not excluded or barred from prosecutorial comment because it may also have a tendency to prejudice the accused. *Hairston.*

■■ Here, Michelle had dated defendant before she met Donald and according to Anthony, she was the source of animosity between Donald and defendant. Just a week prior to the incident in question defendant, in Anthony's presence, said that he loved and desired to marry her. Only a half an hour before his death Donald's expressions of joy over the child newly born to Michelle and himself precipitated defendant's threat to "get" Donald. Although in the ordinary murder case the fact that decedent was survived by a wife and child would be irrelevant, we believe that in the instant case such evidence was relevant to defendant's guilt or innocence and therefore was a proper subject for comment.

■■ Concerning the prosecutorial comment upon defendant's membership in the Latin Kings and the intimidation of witnesses by this group we would also note that defendant in his briefs and during oral argument before this court emphasized that the central issue presented to the jury was the credibility of the testimony given by Anthony and himself. According to Anthony defendant, apparently disturbed by Donald's happiness with Michelle, threatened to "get" and in short order killed Donald. To the contrary defendant placed both Anthony and himself well away from the murder scene and at trial defense counsel brought out that Anthony had initially denied any knowledge of the crime. Under the circumstances the reason why Anthony's denial was inconsistent with his trial testimony became relevant. To this end Anthony testified that based upon his knowledge of Miguel and defendant for nine and seven years, respectively, he knew them to be members of the Latin Kings; that he was fearful his cooperation with the authorities would precipitate Latin King retaliation upon him; and that he had witnessed an

incident of such retaliation caused by the belief of three unidentified Latin Kings that they had been reported to the police. In this context we believe that the prosecutor properly commented that this evidence tended to show that Anthony was credible despite his earlier inconsistent statement. In view thereof, we do not accept defendant's assertion that he was denied a fair trial by the prosecutorial comment concerning the victim's family and membership in the Latin Kings.

Secondly, defendant contends that the ineffectiveness of appointed counsel denied him a fair trial. He premises this argument on the failure of his counsel to object to and move for a mistrial (a) when evidence concerning his feelings for Michelle and membership in the Latin Kings was admitted, and (b) during the subsequent prosecutorial comment thereon.

We have recently stated:

"Counsel is presumed to be competent whenever a court in good faith appoints a member of the bar in good standing to represent the accused in a criminal proceeding, and this presumption is overcome only by strong and convincing evidence of incompetency. (*People v. Jackson* (1976), 41 Ill. App. 3d 816, 354 N.E.2d 643.) The accused bears the burden of clearly establishing incompetence of counsel in carrying out his duties as trial attorney and that substantial prejudice resulted therefrom, without which the outcome would probably have been different. (*People v. Stepheny* (1970), 46 Ill. 2d 153, 263 N.E.2d 83.) Furthermore, the competency of counsel depends upon the particular facts and circumstances of each case (*People v. Witherspoon* (1973), 55 Ill. 2d 18, 302 N.E.2d 3), which are viewed in their totality from a review of the entire record rather than from a narrow focus upon isolated instances occurring during the course of the trial. *People v. Brown* (1975), 30 Ill. App. 3d 732, 332 N.E.2d 580.

\* \* \*

A duty is imposed upon the court to see that counsel assigned by it has sufficient ability and experience to fairly represent defendant in the presentation of his defense (*People v. Blevins* (1911), 251 Ill. 381, 96 N.E. 214); however, the basic requirements of due process are not changed. While a client is entitled to a fair trial, his attorney is not expected to be infallible. (*United States ex rel. Weber v. Ragen* (7th Cir. 1949), 176 F.2d 579.) It is only where such legal assistance amounts to no representation at all that the constitutional requirement will demand reversal. (*People v. De Simone* (1956), 9 Ill. 2d 522, 138 N.E.2d 556.) As stated in *People v. Morris* (1954), 3 Ill. 2d 437, 121 N.E.2d 810, each case will have to be judged on its own particular facts as they appear in the context of the

proceeding under consideration." *People v. Clark* (1977), 47 Ill. App. 3d 624, 630, 365 N.E.2d 20, 26.

We believe that the failure of counsel to object and move for mistrial are isolated instances which do not support a finding of incompetence. During the course of the trial counsel made numerous objections to the admission of evidence, many of which were sustained; he made motions for mistrial on grounds similar to those advanced by appellate counsel; he moved for a new trial based upon prejudicial prosecutorial argument and prior to and during the course of trial, he moved for defendant's discharge arguing that his right to a speedy trial had been violated. Moreover, as defendant's testimony placed himself and Anthony well away from the murder scene, trial counsel brought out and emphasized the fact that Anthony's initial statement also indicated that he was not at the scene. Furthermore, during closing argument defense counsel vigorously emphasized inconsistencies and gaps in the State's case; namely, that while Donald prepared himself to fight defendant, he then inexplicably turned his back on his opponent; that the gasoline station attendant who observed defendant and Anthony at the murder scene was not called to testify; that Anna, who was also in the living room, was not called to support the testimony of Anthony that defendant threatened to "get" Donald; that Anthony made no attempt to secure medical assistance for his brother-in-law who was bleeding to death; and that if defendant had heard Donald's conversation emanating from the kitchen it was improbable that Genaro did not hear those in the living room. From our review of the entire record we are of the belief that defendant was capably represented by his counsel.

For the reasons stated, the judgment appealed from is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.