THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* NATE SANDERS, Defendant-Appellant.

First District (5th Division)   No. 78-1112

Opinion filed June 27, 1980.

Ralph Ruebner and Andrew Berman, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Linda Dale Woloshin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a jury trial, defendant was found guilty of the murders of James Smith and Randolph White (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and was sentenced to a term of 100 to 300 years. On appeal, he contends that: (1) he was denied his statutory right to a speedy trial (Ill. Rev. Stat. 1975, ch. 38, par. 103—5); (2) he was denied his constitutional right to a speedy trial; and (3) he was not proved guilty beyond a reasonable doubt. We affirm. The pertinent facts follow.

On October 3, 1974, Chicago police officers found the bodies of James Smith and Randolph White in the basement of an abandoned building. A warrant for defendant's arrest was issued on November 14, 1974. Defendant was arrested and charged with the murders on March 1, 1975. On April 2, 1975, the State requested to nolle prosequi (nolle pros) the case because it lacked sufficient competent evidence against defendant. The motion was granted and defendant was released. On April 13, 1976, defendant was indicted for the murders and a warrant was issued for his arrest. On December 5, 1976, defendant was arrested for disorderly conduct and a traffic offense and the outstanding murder warrant was executed.

Prior to trial, defendant moved to dismiss the indictment alleging that he had been denied his right to a speedy trial, alleging that the *nolle pros* had been entered to avoid the running of the 120-day statutory period. Ill. Rev. Stat. 1975, ch. 38, par. 103—5.

At the hearing defendant's evidence established the following pertinent facts. Mrs. Stanberry, the sister of Jessie Deloach, who was also charged with the instant murders, testified that upon defendant's release from custody in April 1975, he began living with her mother. After a short residence at a second location, defendant moved in with Mrs. Stanberry where he remained until his arrest in December 1976. This arrangement was known to a number of their friends. Defendant submitted numerous documents bearing that residence as defendant's address. To her knowledge defendant never received letters from the State's Attorney's Office while at that address, nor was he contacted by any Chicago police officers.

In response to defendant's motion, the State introduced the following pertinent testimony. Investigator Smith was investigating the instant murders and defendant's name was first connected to the murders on November 14 or 15 when Scott, Deloach and Byas each gave defendant's name to Smith. The investigator made repeated efforts over a six-week period to locate defendant at various addresses and at his place of employment, but was unsuccessful. During one of his attempts to locate defendant he heard that defendant had left the State for Michigan or Mississippi. A second investigator testified that he spoke to defendant's mother, who told him that she last saw defendant on November 16 when he told her that he was leaving town because the police were looking for him.

When defendant was finally arrested on March 1, 1975, he told an investigator that he had left Chicago to go to Mississippi on October 1 or 2, 1974, and that he knew of the murders before he left. He was then informed that the bodies had not been discovered until October 3, 1974, and stated that he did not care to have any further conversation.

Assistant State's Attorney Elden was assigned to handle defendant's case in which the preliminary hearing was about to be held. After reviewing the police reports and speaking with an investigator, he realized that he could not hold a preliminary hearing since the only evidence against defendant was statements of his codefendants. Elden communicated with his superior and another assistant State's Attorney concerning the situation and was granted two continuances until April 2, 1975. On that date his superior directed Elden to nolle pros the case because of a lack of sufficient competent evidence against defendant and Elden did so, stating his reasons on the record. He further stated that neither defendant's demand for trial nor the 120-day period entered into

the consideration of this decision. At the time of the motion to nolle pros the case, Elden had no intention to reinstate the charges, nor did his superior's order indicate an intention to do so.

Assistant State's Attorney Shalgos was assigned to the courtroom where Keith Scott, Phillip Byas and Jessie Deloach were charged with offenses arising from the deaths of Smith and White. Elden spoke with him about the difficulties with defendant's case. After reviewing the evidence against defendant, Shalgos told Elden's superior that it was his conclusion that there was not enough evidence against defendant to get an indictment. During this conversation the ramifications of the 120-day rule were discussed as well as the case of *People v. McAdrian* (1972), 52 Ill. 2d 250, 287 N.E.2d 688, but not the difference between a *nolle pros* and striking the case with leave to reinstate (SOL).

In early 1976, Shalgos was preparing for the trial of Scott, Byas and Deloach. In January or February, he began negotiations with Scott's attorney, which lasted until April 12, 1976, when Scott testified before the grand jury to indict defendant. After defendant's indictment, repeated attempts to locate defendant were made by police officers who visited defendant's last-known addresses and contacting his family members. These efforts were unsuccessful. Finally, defendant was arrested on December 5, 1976.

After argument, the motion to dismiss the indictment was denied.

The pertinent evidence presented at trial established the following. On October 3, 1974, Chicago police officers entered the basement of an abandoned multiple-story building located at 3743 West 19th Street. A pungent odor emanated from a trunk in the basement, and further inspection revealed a decomposed body behind the trunk. The body appeared to be that of a male and its hands were tied behind its back with an extension cord. The body and the trunk were transported to the morgue where a second decomposing body was discovered under a blanket inside the trunk. The head of the second body was covered with a plastic bag. It was stipulated that the body found outside the trunk was that of James Smith and that the body found inside the trunk was that of Randolph White. It was also established that the two had been deceased for approximately 17 days prior to their discovery.

The pathologist who conducted the autopsies on the two victims testified that James Smith had a large bullet wound in his forehead between his eyebrows and that the internal examination revealed that a bullet had lacerated his brain. Randolph White's body had six bullet wounds in the head, and death was caused by a bullet wound lacerating the brain.

Shelley Edwards, James Smith's former girlfriend, testified that she was with Smith at his apartment at 1140 South Independence on the

evening of September 15, 1974. She spent the night in Phillip Byas' apartment with Smith, Randolph White, Jean Townsend, Byas and Keith Scott. She left at about 6 or 7 a.m. on the following day and drove her car to her home. About half an hour later she returned to pick up Smith who was going to drive her to work. Smith drove her to work, took the car, and was supposed to return to pick her up after work. Shortly after arriving at work, she spoke to Phillip Byas on the telephone and asked that Smith return her call. She never spoke to Smith or saw him alive again. After work she waited for Smith for several hours before accepting another ride home. She went to Phillip Byas' apartment into which Smith and White had moved and stayed there for about five days. During those five days she went upstairs to Smith and White's apartment and saw nothing amiss. She stated that defendant looked familiar but that she did not know his name.

Keith Scott, the State's chief witness, began his testimony by admitting that he had been arrested in connection with the instant homicides and had been charged with two counts of concealing a homicide. In September 1974, he lived with Phillip Byas at 1140 South Independence. Randolph White and James Smith lived on the second floor of the building. On September 15, 1974, he left his apartment at about 5 p.m. When he left Phillip Byas, Randolph White, Shelley Edwards, James Smith, Jessie Deloach and Jean Townsend were present. He returned between 11 and 11:30 p.m. and saw that Shelley Edwards and Gene Townsend were asleep on the living room floor and Phillip Byas and Deloach were asleep in a bedroom adjacent to his own. He went straight to bed.

The next morning, September 16, between 7 and 8 a.m., he was awakened by a tap on his shoulder. He saw defendant standing above him holding two revolvers. Defendant told him that they had just shot "Bubba" White (Randolph's nickname) and told him to hide the revolvers. Scott expressed disbelief but defendant assured him that it was true. Scott told him that he didn't want to get involved but was told "You are here and you are involved so there's nothing you can do." At that time Phillip Byas and Jessie Deloach came toward Scott's room. Defendant handed the guns to Scott who hid them in a car tire in a closet. Deloach then informed them that he didn't think White was dead. The other three went upstairs for a moment and then returned. Byas said that they had to clean the upstairs and defendant suggested that they decide on alibis. The three returned upstairs to clean and shortly thereafter Scott saw them carrying a bloody blanket with a body inside to the rear of the apartment and into the basement. When they returned, Scott and Deloach cleaned the blood from the first floor while Byas and defendant cleaned the upstairs. They then discussed their alibis and how to "take care" of

Smith. Defendant said that if anyone talked they would "get the same thing because he wasn't going to jail for murder."

The phone rang, Byas answered it, announced that it was Shelley Edwards, and she wanted Smith to return her call at work. Smith entered the apartment shortly thereafter, and Byas relayed Miss Edwards' message. Smith attempted to return the call but was stopped by Deloach. Byas then asked Smith if he and White planned to kill him because they said he had stolen their food stamps. Scott related a conversation that took place on September 14, 1974, in which White asked Byas and Deloach whether they had stolen his food stamps. Smith denied any knowledge of the plan but Byas told him that they had already killed White. To convince Smith of this fact, Byas, Deloach and defendant took him to the basement while Scott waited at the head of the stairs. They returned and went into Byas' bedroom where Deloach and defendant were holding guns.

Scott was in his bedroom and could hear Smith plead for his life. Deloach told Smith to put his hands behind his back and tied Smith's hands with an extension cord. Smith continued to plead for his life. Scott heard Smith ask for a cigarette and then heard a crash of glass. Byas, Deloach and defendant ran from the bedroom and said that Smith had jumped from the window. Scott looked out the window but did not see Smith. He went to the front porch and saw Byas at the corner. He did not see any of the others. He heard someone at the rear of the building yell, "I got him" and as he was going to the rear he heard a single shot. He went halfway down the stairs and saw Smith slumped against a wall with a bullet hole in his forehead. Deloach and defendant were pointing guns at Smith and smoke was coming from defendant's gun.

Byas got blankets from the second floor in which to wrap Smith's body and after moving the body into the basement, he began to wrap it. Byas told Scott to get a bag in which to wrap White's body and to clean the blood and glass. Deloach had gone home at his mother's request. Byas and defendant then went to get Smith's keys so they could use Ms. Edwards' car to get a trailer. They returned between 20 and 40 minutes later with a trailer hitched to the rear of Ms. Edwards' car. Byas placed a plastic bag over White's head and defendant, Byas and Scott placed the body in a trunk which Byas' brother, Eddie, had been told to bring. Smith's body was placed in blankets. The bodies were then placed in the trailer.

Defendant and Byas rode in Ms. Edwards' car while Scott and Eddie Byas followed in separate cars. They drove around looking for a building in which to dispose of the bodies and found an abandoned building at 19th and Ridgeway. Scott parked on the corner while Byas and defendant drove into the alley out of Scott's view. After a few minutes Byas and

defendant parked next to Scott and the trailer was empty. Byas told Scott to go to another location and to wait for them while they returned the trailer. When they returned, the trailer was no longer on the car. Byas told Scott to follow him so that he could "ditch" Ms. Edwards' car. They drove to the housing projects at 35th and Federal where Byas and defendant parked Ms. Edwards' car and joined Scott.

They returned to Scott's apartment and discussed their alibis. Byas decided that he had a doctor's appointment while defendant decided to make up his own. Scott was to say that he was not present at the time of the murders. Defendant again stated that if anyone talked, he would get the same thing since he was not going to be charged with murder by himself. Scott then took defendant home and Byas to his doctor's appointment.

At trial Scott identified the trunk, the blanket in which White's body was found, and White's clothing. He identified a picture of Smith's body with its hands tied by the extension cord. He also identified photographs of Ms. Edwards' car and the trailer used to remove the bodies.

In October 1974, Chicago police officers contacted Scott about the disappearance of Smith and White. Scott admitted that at that time he lied about what he knew.

On cross-examination Scott testified that Phillip Byas was his closest friend and that he had seen defendant several times before the killings. He also testified that on September 14 White had told Smith that he was going to take care of Phillip Byas and that Jessie Deloach, Byas' cousin, had overheard the conversation. In addition, during early September 1974, Byas had told Scott of an altercation between Byas and White when Byas attempted to return a gun which he had borrowed without permission.

Scott stated that the sight of the guns and the bodies caused him to be fearful of defendant. When the police first came to speak to him in October, he told them that he did not know the victims very well and that he couldn't give them any more information. At that time he feared for his life and he was afraid of defendant and of any punishment he might receive for his part in the crimes. On about November 14, the police came to his home a second time and took him into custody. Scott told an investigator and an assistant State's Attorney that he knew little of the victims and that he had last seen them on September 15. He also told an investigator that when he awoke on September 16 at 11 a.m. or 12 p.m. the only people in the apartment were Phillip Byas and Jessie Deloach. He did not see or hear anything unusual and first learned of the murders on September 17 when Byas, Deloach and defendant told him of the killings. Scott admitted at trial that this version was untrue but stated that he lied during the interview because he was afraid both of being punished

for his part in the crime and of defendant and his threat. The first version was basically the alibi that had been worked out on the day of the murders. Later, the investigator told him that no one would know if he named the murderers. Scott then told the investigator that Byas, Deloach and defendant were involved in the murders. Corrections were made in his earlier statement and Scott signed it.

After speaking with the investigator he gave a signed statement to an assistant State's Attorney. He initially gave the earlier version of the events of the day of the murders but later described his participation in disposing of the bodies. The written statement described how Byas and defendant loaded the trunk and placed it on the trailer, how Scott followed defendant and Byas who were driving Ms. Edwards' car, and how Byas and defendant drove to the place where the bodies were eventually recovered. The statement also described how Scott waited until the trailer was returned and drove to 31st or 35th and Federal where Byas and defendant got into his car and were driven home.

After making the statement, Scott was charged with concealing the homicides. In late 1975 or early 1976, he was offered immunity from prosecution for those offenses in exchange for his testimony, and he accepted the offer. However, when the case came to trial, Scott refused to testify because of fear for his life and the lives of his family. He was finally compelled to testify through the contempt powers of the court.

The president of a gas station testified that part of his business included washing cars and renting trailers. He was contacted by police sometime in November 1974 and he provided them with an original of a standard trailer rental form which contained defendant's written name, his address, driver's license number, phone number, license plate number, and a description of the car to which the trailer was hitched. The first initial of the driver's license was "S" and the license number of the car was "HA 167." The time stamp on the form showed that the trailer was taken at 9:30 a.m. on September 16, 1974, and was returned at 11:37 a.m. on the same day.

On August 23, 1977, pursuant to court order, defendant filled out a handwriting exemplar form and signed his name on the document. A document examiner of the Chicago Police Department compared defendant's signature on the exemplar with an employment application which defendant stipulated was signed by him and with the trailer rental contract. It was the examiner's opinion that all three signatures were executed by the same person.

A police investigator testified that he and his partner located Ms. Edwards' automobile with license plate number "NA 8167" at 3625 South Federal.

It was also stipulated that if called as a witness, a certain evidence

technician would testify that on October 14, 1974, he examined the trunk in which White's body was found for fingerprints but that no fingerprint impressions suitable for examination were found. The State rested.

Defendant called two witnesses in defense. The first was the forensic pathologist who had performed the autopsies on the victims. He testified that as part of his autopsy of James Smith he observed the victim's skin. He did not observe any cuts or glass splinters in his skin nor did he find any broken bones other than the fractured skull which was caused by a bullet. Both bodies were in a state of decomposition usually represented by a grayish discoloration of the skin, softening of the tissue within the skin and extensive peeling of the superficial skin layer. The pathologist concluded that it was possible that there were superficial abrasions, such as cuts by glass, on Smith's skin which were no longer visible at the time of the autopsy.

Shelley Edwards testified that she went to Phillip Byas' and Keith Scott's apartment on September 16 or 17 and remained there for five days. She testified that neither Byas nor Scott closed off any rooms to her, nor did she recall seeing any broken windows or feeling any cool air in the apartment. On cross-examination she stated that while there, she stayed in the living room. She did not recall if she ever went into Byas' bedroom and stated that a window could have been broken in the room. She also stated that there could have been cool air in the apartment.

The defense rested. The jury found defendant guilty of both murders and judgment was entered on the verdicts. Defendant was sentenced to a term of 100 to 300 years and brought this appeal.

Opinion

I.

Defendant contends that his stautory right to a speedy trial (Ill. Rev. Stat. 1975, ch. 38, par. 103—5) has been violated in the instant case since the State sought to avoid the statutory term by entering the *nolle pros* of the original complaint. The State argues that since there was no charge pending against defendant after the *nolle pros* and he was neither incarcerated nor on bond for the offenses, the statutory speedy trial provisions were not violated by the delay between the *nolle pros* and the indictment. The State asserts that the *nolle pros* had the same effect as a finding of no probable cause at a preliminary hearing since both would terminate the prosecution. In addition, the State submits that the evidence presented at the hearing to dismiss the indictment clearly showed that the reason for the *nolle pros* was the lack of sufficient competent evidence against defendant and not an attempt to evade the statutory term.

Section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 103—5) provides in pertinent part:

"(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant, * * *.

(b) Every person on bail or recognizance shall be tried by the court having jurisdiction within 160 days from the date defendant demands trial unless delay is occasioned by the defendant, * * *.
* * *

(d) Every person not tried in accordance with subsections (a), (b) and (c) of this Section shall be discharged from custody or released from the obligations of his bail or recognizance."

This section expressly applies only to persons either "in custody" or "on bail or recognizance" and has been construed as being inoperative unless charges are pending against a defendant. (*People v. Toney* (1978), 58 Ill. App. 3d 364, 367, 374 N.E.2d 695; *People v. Lowe* (1965), 61 Ill. App. 2d 262, 266, 210 N.E.2d 31.) The crucial inquiry in this case is whether a *nolle pros* tolls the stautory term or allows it to continue to run.

Research has not revealed an Illinois case which has addressed the precise factual situation presented here. Cases dealing with speedy trial questions raised by the dismissal of charges and their subsequent reinstatement generally distinguish between three separate types of dispositions. They are: (1) a finding of no probable cause at a preliminary hearing; (2) the charges being stricken with leave to reinstate (SOL); and (3) a *nolle pros* of the charge.

■■ When a defendant is discharged after a finding of no probable cause after a preliminary hearing in the absence of a showing that the State purposely secured that finding as an evasionary tactic, the rule is that the speedy trial period does not continue to run after the dismissal, and that a totally new period begins to run when defendant is subsequently indicted. (*People v. Gimza* (1977), 56 Ill. App. 3d 477, 371 N.E.2d 1135; *People v. Toney* (1978), 58 Ill. App. 3d 364, 367, 374 N.E.2d 695; *People v. Garcia* (1978), 65 Ill. App. 3d 472, 475, 382 N.E.2d 371.) On the other hand, where charges are stricken with leave to reinstate (SOL), the rule is that the statutory period continues to run after that disposition. (*People v. Baskin* (1967), 38 Ill. 2d 141, 145, 230 N.E.2d 208; see *People v. Griffin* (1978), 58 Ill. App. 3d 644, 646, 374 N.E.2d 1031; *People v. Garcia; People v. Toney; People v. Gimza.*) The reason for the distinction between an SOL and a finding of no probable cause was stated in *People v. Toney* as follows:

"* * * Where a charge has been stricken with leave to reinstate, the same charge subsequently may be reinstated. After a discharge for want of probable cause, however, the proceedings may begin again only after the State secures additional evidence and files new

charges against the defendant. A dismissal for lack of probable cause is a judicial determination in favor of the defendant rather than a voluntary act on the part of the State. Where charges are dismissed upon a judicial determination of no probable cause, the State has little opportunity to manipulate the proceedings or to purposefully evade the operation of the statutory term." (58 Ill. App. 3d 364, 368.)

The nature of an SOL was discussed further in *People v. Griffin* where the court stated:

"\* \* \* In the latter case [SOL] the charges continue to lie against the accused, albeit in a dormant state, and they may be resurrected upon the State's motion at any time. Because such a procedure occurs upon the State's motion and does not effectively terminate a prosecution upon the initial charges, it has been held that the statutory speedy trial term continues to run after the charges have been stricken with leave to reinstate as long as the defendant demands trial." (58 Ill. App. 3d 644, 646.)

Clearly, because of the nature of the SOL, a defendant's anxiety and concern over his accusation of a crime would continue after the entry of such an order.

What then is the nature of a *nolle prosequi?* In *People v. Watson* (1946), 394 Ill. 177, 68 N.E.2d 265, *cert. denied* (1946), 329 U.S. 769, 91 L. Ed. 662, 67 S. Ct. 130, the following explanation was given:

"\* \* \* 'A *nolle prosequi* is not a final disposition of the case, and will not bar another prosecution for the same offense. It is not an acquittal, but it is like a nonsuit or discontinuance in a civil suit, and leaves the matter in the same condition in which it was before the commencement of the prosecution.' [Citation.] Again, it has been said that the ordinary effect of a *nolle prosequi* is to terminate the charge to which it is entered and to permit the defendant to go wherever he pleases, without entering into a recognizance to appear at any other time. If it is entered before jeopardy has attached, it does not operate as an acquittal, so as to prevent a subsequent prosecution for the same offense." 394 Ill. 177, 179.

Unless his actions are vexatious or repetitious, the State's Attorney has the absolute power to nolle pros a charge and if it is refused, a court may be compelled to enter an order of *nolle pros. (People ex rel. Castle v. Daniels* (1956), 8 Ill. 2d 43, 47-48, 132 N.E.2d 507; *People ex rel. Elliott v. Covelli* (1953), 415 Ill. 79, 89-90, 112 N.E.2d 156.) The decision to nolle pros lies within the nearly unfettered discretion of the State's Attorney and could be used to manipulate proceedings in the same way as an SOL. See *People v. Fosdick* (1967), 36 Ill. 2d 524, 224 N.E.2d 242; *People v. Lee* (1969), 44 Ill. 2d 161, 254 N.E.2d 469.

Case law generally treats an SOL and *nolle pros* similarly for purposes of speedy trial. (*People v. Gimza*; *People v. Garcia*; *People v. Toney*.) Each of these cases expressly states that the statutory term continues to run if the State either nolle prosses a case or SOLs it. However, the issue in each of those cases was whether a finding of no probable cause at a preliminary hearing tolled the statutory term to allow the defendant's later indictment and prosecution. The cases consistently held that such a finding does not toll the term. The statements concerning the effect of a *nolle pros* were therefore dicta. The authorities relied on in each case for the statement concerning the *nolle pros* were *People v. Fosdick* and *People v. Lee*. In those cases it is unclear if the court is dealing specifically with charges which were nolle prossed because the court in *Lee* merely states that "the State moved to dismiss" (44 Ill. 2d 161, 165) and in *Fosdick* that "Champaign County voluntarily dismissed its charges." (36 Ill. 2d 524, 528.) However, since an SOL is not a dismissal of a charge but a suspension of it, and the *nolle pros* is actually a dismissal of those particular charges and is done in the State's discretion, we conclude that the charges in *Fosdick* and *Lee* must have been nolle prossed. This conclusion is supported by the fact that *Gimza, Garcia* and *Toney* each considered the dismissals as *nolle prosses.*

*Fosdick* and *Lee* clearly state that the statutory period continues to run when the original charges are nolle prossed and the defendant is subsequently prosecuted. However, in both cases and in the older case of *Brooks v. People* (1878), 88 Ill. 327, relied on by the court in *Lee*, the defendant remained in custody during the period after the *nolle pros* and until indictment or reindictment. In that respect those cases are clearly distinguishable from the instant case. Here defendant was out of custody for over a year before he was indicted for the murders.

As already concluded, a *nolle pros* and an SOL are treated similarly in that neither of them tolls the statutory period where the defendant remains in custody or on bond or recognizance. The crucial issue here is whether the period continues to run even though defendant is not in custody or on bail or recognizance. This was the basis for the trial court's ruling that the speedy trial act was inapplicable to defendant. *People v. Bauer* (1979), 70 Ill. App. 3d 537, 388 N.E.2d 1013, dealt with this issue in the context of an SOL. There an information was SOL'd and defendant was released from bail. Defendant was subsequently indicted and admitted to bond 170 days after the SOL. The question presented was whether the 170 days after the SOL during which time defendant was not on bond or in custody should be counted as part of the statutory 160-day period. The court found *People v. Baskin* (1967), 38 Ill. 2d 141, 230 N.E.2d 208, wherein the supreme court stated that dismissal of a criminal matter with leave to reinstate did not toll the statutory period, to be

dispositive, and counted the 170-day period in which defendant was neither in custody or on bail towards the statutory period. However, *Bauer* neglected to note that in *Baskin* the defendant was "on bond at all times subsequent to the filing of the complaint" (38 Ill. 2d 141, 145) bringing *Baskin* within the express provisions of the speedy trial statute. The *Bauer* court did not discuss the applicability of the statutory period to a defendant who was not in custody or on bond.

In any event there are sufficient differences between an SOL and a *nolle pros* to find that the statutory period is tolled by a *nolle pros* where the defendant is neither in custody nor on bail or recognizance. As already noted, when a charge is SOL'd, it continues to lie against the defendant in a dormant state. The prosecution is not terminated and may be reinstated at any time upon the State's motion. The *nolle pros* terminates the charge and requires the institution of a new and separate proceeding to prosecute a defendant for that offense. Our *nolle pros* is distinguishable from the "*nolle prosequi* with leave" in *Klopfer v. North Carolina* (1967), 386 U.S. 213, 18 L. Ed. 2d 1, 87 S. Ct. 988, which allowed the prosecutor to reinstate the charge on his own motion. That procedure closely resembled our SOL. After an SOL, a defendant would still be charged with the offense, while after a *nolle pros* that charge would be terminated. When a charge is nolle prossed and the defendant released from custody without bond, there is no charge pending against him. Since the speedy trial statute runs only when a charge is pending against a defendant (*People v. Lowe* (1965), 61 Ill. App. 2d 262, 210 N.E.2d 31; *People v. Gimza* (1977), 56 Ill. App. 3d 477, 371 N.E.2d 1135) and no charge was pending after the *nolle pros,* the period from April 2, 1975, to December 5, 1976, should not be counted towards the statutory term. When that period is omitted, it is clear that defendant's statutory right was not violated. While we recognize that *Fosdick* and *Lee* may suggest a contrary result, here, unlike those cases, defendant did not remain in custody or on bond after the *nolle pros.*

This case is similar to *United States v. Flores* (2d Cir. 1974), 501 F.2d 1356, which involved the interpretation of court rules for achieving prompt disposition of criminal cases. The rules required that the government be ready for trial within six months of the date of arrest or charge unless the term was tolled for various reasons. Four months and 27 days after defendant's arrest, the complaint was dismissed because the government determined that it had insufficient evidence when a witness refused to cooperate. Four months later, when the witness agreed to testify, defendant was indicted. In determining whether defendant's speedy trial rights under the rules had been violated, the court stated:

"The Government contends, and we accept, that for the period after the dismissal of the complaint against appellant and prior to

appellant's indictment the clock should not run against it. During this period appellant was not subject to any of the disabilities associated with being under arrest, the subject of a complaint or indictment, or in the midst of a criminal prosecution. He was under no more jeopardy than any other citizen, and the fact that he might have been under investigation has no more effect after the dismissal on the running of the six-month period than it would have had before his arrest, that is, none." 501 F.2d 1356, 1359-60.

*Flores* was later followed and a similar result reached in *United States v. Hillegas* (2d Cir. 1978), 578 F.2d 453. We find the reasoning of those cases persuasive and reach a similar conclusion that defendant's statutory right was not violated under the circumstances of this case.

Perhaps most importantly, the record in the instant case does not evidence an attempt by the State to evade the speedy trial act by use of the *nolle pros.* As was recognized in dicta in *People v. McAdrian* (1972), 52 Ill. 2d 250, 255, 287 N.E.2d 688, "the real issue, when a charge against a defendant is dismissed and he is later re-indicted on the same offense, may be whether the circumstances suggest that the State is seeking to evade the consequences of the 120 day rule, or whether the delay, in any event, would constitute a denial of the defendant's constitutional right to a speedy trial."

Defendant contends that the State's intent to evade the statutory period is evidenced by the fact that from the time of the *nolle pros* until the indictment and second arrest, no new evidence against him was discovered. While the State concedes that it did not gain any additional evidence before the indictment, it is clear that it gained Scott's cooperation which it needed to proceed to trial. Contrary to defendant's suggestion, the State did not change Scott's testimony between the *nolle pros* and the indictment. Scott's later statements to the police and assistant State's Attorney were consistent with his trial testimony. As soon as Scott's cooperation was secured, defendant was indicted and attempts to locate him began. The record shows diligent efforts to locate defendant after his indictment and does not demonstrate an attempt to delay his arrest.

■■ We therefore find that defendant's statutory right to a speedy trial was not violated where he was neither in custody nor on bond or recognizance after the charges against him were nolle prossed, and there is no evidence that the dismissal of the charges was undertaken to evade the statutory period.

■■ Defendant also contends that the 21-month delay between his first arrest and the first delay attributable to him (a by-agreement continuance on December 13, 1976) deprived him of his Federal constitutional right to a speedy trial (U.S. Const., amend. VI) which is applicable to the States through the fourteenth amendment. (U.S. Const., amend. XIV; see

*Klopfer v. North Carolina* (1967), 386 U.S. 213, 18 L. Ed. 2d 1, 87 S. Ct. 988.) Determination of whether defendant's constitutional right to a speedy trial has been violated requires consideration of four factors: (1) the length of the delay; (2) the reasons for the delay; (3) defendant's assertion of his right; and (4) prejudice to defendant. *Barker v. Wingo* (1972), 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182; *People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876.

The delay of which defendant complains is approximately 21 months. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." (*Barker v. Wingo* (1972), 407 U.S. 514, 530, 33 L. Ed. 2d 101, 117, 92 S. Ct. 2182, 2191.) The delay in the instant case is not so great as to be presumptively prejudicial. (See *People v. Henry*, delay 25-26 months; *People v. Jones* (1976), 37 Ill. App. 3d 515, 346 N.E.2d 430, delay 23 months; *People v. Gray* (1972), 7 Ill. App. 3d 526, 288 N.E.2d 26, delay 45 months.) In addition, when the other factors are balanced, it is clear that defendant was not denied his constitutional right to a speedy trial.

Defendant asserts that no justification for the delay appears in the record. On the contrary the record reveals that the reasons for the delay were the unavailability of competent evidence against defendant and the inability to locate him after his indictment. While it may be true that defendant did not cause any delay before his second arrest, the record shows no attempt by the State to hamper the defense and no lack of diligence in prosecuting defendant. (*Barker v. Wingo*; *People v. Henry*.) As the Supreme Court recognized in *Barker v. Wingo*, a missing witness may be a valid reason for delay. (407 U.S. 514, 531, 33 L. Ed. 2d 101, 117, 92 S. Ct. 2182, 2192.) Although Scott was not "missing" the record is clear that he would not testify against defendant until an agreement to drop the charges against him was completed and even then hesitated at trial because of his fear of defendant. Unlike *People v. Harflinger* (1977), 49 Ill. App. 3d 31, 35, 363 N.E.2d 875, in this case it is clear that Scott would have refused to testify earlier and that the delay was justified.

The third factor to be considered is whether defendant asserted his right to a speedy trial. Following the *nolle pros* defendant asserted his right by demanding trial. However, at that time no charge was pending against him, a situation similar to a discharge upon a finding of no probable cause. (See *People v. Toney* (1978), 58 Ill. App. 3d 364, 367, 374 N.E.2d 695; *People v. Griffin* (1978), 58 Ill. App. 3d 644, 646, 374 N.E.2d 1031.) While such a demand may have been effective if defendant had remained in custody or had been released on bail, here he was under no restraint or charge and the demand to be tried on nonexistent charges must be considered ineffective. (*Toney*; *Griffin*.) In addition, after his second arrest, the defendant was responsible in part for delays in his trial

and did not bring the petition for discharge until 3½ months after his arrest. Under these circumstances it cannot be said that defendant vigorously asserted his right to a speedy trial.

Finally, the prejudice to the defendant must be considered in light of the interests which the speedy trial right is designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize the accused's anxiety and concern; and (3) to limit the possibility that the defense may be impaired. *Barker v. Wingo* (1972), 407 U.S. 514, 532, 33 L. Ed. 2d 101, 118, 92 S. Ct. 2182, 2192.

Defendant was in custody for approximately one month prior to the *nolle pros* and the last two weeks before trial. We do not view this incarceration as excessive or oppressive in a speedy trial context. During the months after the *nolle pros* no charge was pending against defendant and he was not "living under a cloud of anxiety, suspicion, and often hostility" (*Barker v. Wingo* (1972), 407 U.S. 514, 533, 33 L. Ed. 2d 101, 118, 92 S. Ct. 2182, 2193) so as to cause him to suffer concern over his prosecution. These interests protected by the speedy trial right were not infringed upon in defendant's case.

Finally, the impairment of the defense caused by the delay must be considered. At trial defendant asserted that he was unable to recall his whereabouts on the date of the murders and was unable to locate a potential witness, a woman with whom he had been living. Defendant does not urge these grounds on appeal and we assume that he concluded, as the trial court did, that these contentions were unfounded. The record fails to disclose any prejudice suffered by defendant because of the delay.

Balancing the four factors found in *Barker*, it is clear that defendant was not denied his constitutional right to a speedy trial.

■■ Defendant also contends that he was denied due process of law because the State nolle prossed the original complaint and then consciously and intentionally delayed his second arrest to effect a change in Scott's testimony and to gain a second statutory period in which to try the case. To constitute a due process violation it must be shown that the delay between crime and arrest or charge caused substantial prejudice to the defendant's right to a fair trial and that the delay was an intentional device to gain a tactical advantage over the accused. (*United States v. Marion* (1971), 404 U.S. 307, 323-24, 30 L. Ed. 2d 468, 480, 92 S. Ct. 455; see *People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244.) Defendant has not alleged that he has suffered any actual prejudice at trial except that Scott was willing to testify against him at that time. This is not the kind of prejudice necessary to establish a due process violation caused by a delay in prosecution. As already discussed, the *nolle pros* and later prosecution were not done to gain a second statutory term and thereby evade the

speedy trial statute or to gain a tactical advantage over defendant. We therefore find this contention to be without merit.

## II.

Defendant contends that he was not proved guilty beyond a reasonable doubt because: (1) there was no evidence presented to show that "defendant's criminal agency" caused the deaths of the victims; (2) Keith Scott's testimony was thoroughly impeached, unworthy of belief, and suspect because of his own involvement in the crimes; and (3) the circumstantial evidence presented did not substantially corroborate Scott's testimony.

Defendant initially contends that because Scott did not actually see him shoot either victim and the weapons were never produced at trial, the State failed to prove that he caused the victims' deaths. The evidence presented at trial was sufficient to prove beyond a reasonable doubt that defendant caused White and Smith's deaths. Although White had already been killed when defendant woke Scott, defendant freely admitted his responsibility for the killing and enlisted Scott's aid for the disposal of the body. Later, when Smith came home, Scott heard Smith pleading for his life and then the crash of a window. Although he lost sight of defendant in the confusion that followed, within seconds of hearing a single shot, he saw defendant pointing a smoking pistol at Smith who now had a bullet hole in his forehead. The fact that Scott did not actually see defendant pull the trigger is immaterial. Defendant's admission of guilt for White's slaying and the circumstances surrounding Smith's death which Scott related were clearly sufficient to permit the jury to conclude that defendant had caused the deaths.

Defendant asserts that there was no corroboration of Scott's story linking him to the guns nor were the guns introduced at trial to establish that link. While the introduction of the guns at trial coupled with testimony that defendant's fingerprints covered them would have been ideal, their unexplained absence does not weaken Scott's testimony. Defendant was not arrested until 5½ months after the murders. As the State notes, this was ample time for a man who was cautious enough to suggest alibis immediately after the crimes to dispose of the weapons. The evidence showed that the victims had been shot and that defendant was responsible. Obviously the jury found that the guns existed at the time of the murders and that their absence at trial did not raise a reasonable doubt of defendant's guilt.

Defendant next challenges Scott's testimony asserting that it was unbelievable because: (1) he was an "accessory after the fact" who had been granted immunity from prosecution; and (2) he originally lied to the

police about his knowledge of the murders and was "thoroughly impeached" at trial.

The State acknowledges that Scott was granted immunity from prosecution for concealing the deaths of the victims but disputes defendant's assertion that his testimony should be considered as that of an accomplice. A witness is an accomplice if he could have been indicted for the offense as a principal or an accessory. (*People v. Robinson* (1974), 59 Ill. 2d 184, 190-91, 319 N.E.2d 772; *People v. Wade* (1979), 71 Ill. App. 3d 1013, 1020, 389 N.E.2d 1230.) The evidence did not indicate that Scott participated in the murders or could be held accountable for them. (See *People v. Wade.*) While Scott could not have been indicted for the murders, defendant contends that his participation in the events warrants careful scrutiny of his testimony. The State maintains that even if Scott's testimony is viewed as that of an accomplice, it was sufficient to prove defendant's guilt beyond a reasonable doubt.

Whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is in the province of the jury. (*People v. Wilson* (1977), 66 Ill. 2d 346, 349, 362 N.E.2d 291.) Even if Scott were to be considered an accomplice, his testimony was sufficiently corroborated to carry an "absolute conviction of the truth." (*Wilson*, at 349-50.) Scott described the exact manner that the bodies were found by the police with Smith's hands tied with the electric cord and a plastic bag covering White's head. He correctly described the location of the building where the bodies were found and the area where Ms. Edwards' car had been abandoned. Finally, the trailer receipt proved that defendant rented the trailer during the time period in question and that it was used for a short period of time as described by Scott. These factors were all corroborative of Scott's testimony and would lead to the conclusion that his testimony was accurate and truthful. The evidence as a whole is not so improbable as to raise a reasonable doubt of defendant's guilt. *People v. Yarbrough* (1977), 67 Ill. 2d 222, 227, 367 N.E.2d 666.

Defendant contends that the inconsistencies between Scott's earlier statements to the police and assistant State's Attorneys in which he professed ignorance of the circumstances of the murders and his trial testimony in which he detailed the events demonstrate his untrustworthiness. He suggests that Scott's trial testimony was motivated by malice toward defendant and a desire to fulfill his bargain for immunity. In addition, he asserts that the fact that Scott was not threatened after the day of the murders belies Scott's assertion that the earlier statements were motivated by fear.

In *People v. Smith* (1962), 25 Ill. 2d 428, 185 N.E.2d 150, a key

witness' testimony changed between defendant's first and second trial and defendant was convicted at the second trial. Defendant charged that testimony at the second trial was perjury and was improperly used to convict him. The court answered this contention by saying:

"All of the facts covering his change in testimony at the former trial were brought out before the jury at the second trial and he testified that his testimony at the present trial was true and that his original testimony was not true. The fact that this witness changed his testimony does not establish that he was committing perjury on the second trial. The circumstances were fully brought out before the jury who had the right to pass upon the witness's credibility." 25 Ill. 2d 428, 431.

■■ The same is true of this case. The jury was well aware of the fact that Scott's trial testimony varied from his earlier statements and of his alleged reason for the variance. Those circumstances would be considered in assessing Scott's credibility and the weight to be given to his testimony. The jury obviously believed that the earlier statements were made out of fear of reprisal and that Scott's trial testimony was truthful. A reviewing court may not substitute its judgment for the jury's on questions involving the weight of the evidence and the credibility of witnesses. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) The jury's determination was fully supported by the evidence. We will not disturb that verdict.

Defendant's contention that Scott was "thoroughly impeached" is also unfounded. He cites only two instances of impeachment and both involved minor points unrelated to the events of the day of the murders. We therefore find this claim to be without merit.

Defendant asserts that the pathologist's testimony indicating that Smith's body had no visible trauma or external injuries and Shelley Edwards' testimony that she did not recall seeing any broken window in the apartment after the murders contradicts the notion that Smith jumped from the window. Defendant neglects to note that the pathologist also testified that due to the advanced state of decomposition of Smith's body it was possible that superficial abrasions such as glass cuts would not be visible. In addition, Shelley Edwards testified that she did not go into Byas' room and that the window could have been broken. When considered *in toto* the two witnesses' testimony does not contradict Scott's version of the events preceding Smith's death.

Finally, defendant contends that the only evidence other than Scott's incredible testimony was circumstantial and insufficient to prove his guilt. As already discussed, the jury found Scott credible and we will not disturb that determination. We note that the other evidence set forth

earlier in this opinion corroborated Scott's testimony in many regards and established defendant's guilt beyond a reasonable doubt.

Accordingly, the judgments of the trial court are affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.