Maurice A. JOHNSON, Appellant,

v.

UNITED STATES, Appellee.

Michael O. JOHNSON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 79–391, 79–404.

District of Columbia Court of Appeals.

Argued March 19, 1981.

Decided Aug. 4, 1981.

Thomas W. Farquhar, Washington, D. C., appointed by the court, for appellant Maurice A. Johnson.

Martin S. Echter, Washington, D. C., appointed by the court, with whom Michael L. Rankin, Washington, D. C., was on the brief, for appellant Michael O. Johnson.

David Howard Saffern, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty., and John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, KERN and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellants, who are brothers, were jointly charged in a three-count indictment with first-degree (felony) murder while armed, D.C.Code 1973, §§ 22–2401, –3202; second-degree murder while armed, id., §§ 22–2403, –3202; and armed robbery. Id., §§ 22–2901, –3202. A jury acquitted them of murder but convicted them of armed robbery.

Both appellants contend that the trial court erred in denying their motions to dismiss the indictment on speedy trial grounds. Individually, Maurice Johnson contends that his conviction violates the constitutional prohibition against double jeopardy. Michael Johnson contends (1) that the admission of a prior consistent statement of the government's principal witness was prejudicial error, and (2) that the trial court erred in denying his motions for a judgment of acquittal. We affirm.

## I

Jimmy Robinson, while either asleep or in an alcohol-induced stupor, was beaten to death with a lead pipe and robbed of three dollars.[1] Appellants and Oscar Lee Scott had been drinking with Robinson in the vacant house where his body was found. They split the proceeds among themselves, thus netting a dollar apiece.

Scott, who pleaded guilty to second-degree murder in connection with Robinson's death, was the government's key witness. Scott testified that he had spent the night before the murder with his girl friend in a vacant house on Wylie Street in northeast Washington. Early the next morning, after his girl friend had left, Scott joined appellants (whom he knew as "Wee-Wee" and "Tootsie"), Robinson, and two others who were drinking in the vacant house next door to where he had slept.

When the two men who were with them had left, Wee-Wee (appellant Maurice Johnson) asked Scott if he had any money so that he could buy more liquor. Tootsie (appellant Michael Johnson) told his brother that Robinson, who was sitting on the couch, had $60. Wee-Wee decided that he would take the money from Robinson and asked Scott if he wanted to be in on it. Scott declined, but followed Wee-Wee to an adjoining room where Wee-Wee picked up a pipe and wrapped a shirt around it, planning to "knock [Robinson] out" with it. Tootsie remained in the room with Robinson until Scott and Wee-Wee returned.

When Wee-Wee raised the pipe with both hands, Scott went next door for a drink of water. Upon his return moments later, Wee-Wee still was holding the pipe and Robinson was lying on the couch. Appellants rolled their victim onto the floor and went through his pockets, retrieving the three dollars which they and Scott split three ways. Michael Johnson removed his bloodstained pants, and directed Scott to throw them away while he put on another pair from a bag of clothes which he kept in the house. Scott and appellants then left.

The extent of Scott's involvement in the killing was disputed by the testimony of other witnesses. Debra Cabbell, his girl friend, testified that, later on the day Robinson was killed, Scott told her that he had been in a fight and that "he beat somebody's ass." Scott denied having made that statement to Cabbell, or even having seen her again that day. Kathryn Mary Gross, who dated Scott's brother, testified that on the day of the offense, Scott telephoned her and asked if he could come over since he had been in a fight. When he arrived, he told her he had been fighting over money in an empty house on Wylie Street. At that time, he did not mention that anyone else had been involved. Scott admitted having gone to Gross' house that day, but denied having told her he had been in a fight.

Finally, Rosemary Bartley, Maurice Johnson's girl friend, testified that she saw Scott some time after the killing. He told her that he had been in a fight with Robinson, and that "[h]e had picked up a piece of pipe and hit him." She testified further that Debra Cabbell had told her that Scott had made the same inculpatory remark to her. Scott denied ever having talked to Bartley about the events surrounding Robinson's death.

Neither appellant testified.

## II

Both appellants contend that they were denied their Sixth Amendment right to a

---

1. An autopsy disclosed that, at the time of his death, the victim's blood alcohol level was nearly three times the amount at which one is presumed to be intoxicated if driving.

speedy trial. Michael Johnson was arrested and charged with second-degree murder on August 24, 1977, ten days after Robinson's death. A month later, Maurice Johnson was arrested on the same charge. On December 22, 1977, the charges against appellants were dropped by the government for lack of sufficient evidence. Eight months later, on August 16, 1978, Oscar Lee Scott pleaded guilty to second-degree murder in the case. At that time, he agreed to testify against appellants both before a grand jury and at trial. On October 4, 1978, appellants were indicted. They went to trial four months later.

■ Appellants contend that the nine-and-a-half-month period between the dismissal of charges against them and their subsequent indictment is chargeable to the government. Accordingly, the period of time between their initial arrests and the trial (18 months for Michael Johnson; 17 months for Maurice Johnson) would give prima facie merit to their speedy trial claim and place a burden on the government to justify the delay. *Branch v. United States*, D.C.App., 372 A.2d 998, 1000 (1977). In denying appellants' motion to dismiss the indictment, the trial court concluded that the relevant time period constituted good faith investigative delay which should not be counted against the government in calculating the length of delay for speedy trial purposes. We agree.

■ It is well recognized that the government is under no obligation to file charges against a defendant at any particular time. *See United States v. Lovasco*, 431 U.S. 783, 791, 91 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977); *Tolliver v. United States*, D.C. App., 378 A.2d 679, 681 (1977). On the other hand, "[w]henever the Government's action at any stage of the proceeding indicates bad faith, neglect, or a purpose to secure delay itself or some other procedural advantage, the resulting delay is not justified." *United States v. Lara*, 172 U.S.App. D.C. 60, 64, 520 F.2d 460, 464 (1975), quoting *United States v. Bishton*, 150 U.S.App.D.C. 51, 54, 463 F.2d 887, 890 (1972).

In sanctioning a pre-indictment delay of 18 months we noted in *Tolliver v. United States, supra*, that "[i]nvestigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over the accused." 378 A.2d at 681. Investigative delay "is not so one-sided" as tactical delay. *United States v. Lovasco, supra*, 431 U.S. at 795, 97 S.Ct. at 2051. Thus, it is quite appropriate, as occurred in this case, for the government to postpone filing charges until such time as it determines that it has sufficient evidence to make out a case. *Id.*, at 794–95, 97 S.Ct. at 2051. The period of time which may be needed to obtain the cooperation of witnesses is deemed reasonable investigative delay, rather than a period of time used "to gain a tactical advantage" over a defendant. *Tolliver v. United States, supra*, 378 A.2d at 681; *People v. Sanders*, 86 Ill.App.3d 457, 468, 41 Ill.Dec. 453, 464, 407 N.E.2d 951, 962 (1980). *Cf. United States v. Lara, supra*, 172 U.S.App.D.C. at 65, 520 F.2d at 465 (the government's dismissal of an indictment to seek more favorable treatment in another jurisdiction was "dictated by tactics and not by necessity"; government must be charged with the delay).

Moreover, there was no prejudice from the earlier dismissal of charges against them and their subsequent indictment. As expressed by another court:

> During this period appellant[s were] not subject to any of the disabilities associated with being under arrest, the subject of a complaint or indictment, or in the midst of a criminal prosecution. [They were] under no more jeopardy than any other citizen, and the fact that [they] might have been under investigation has no more effect after the dismissal on the running of the [speedy trial period] than it would have had before [their] arrest, that is, none. [*United States v. Flores*, 501 F.2d 1356, 1359–60 (2d Cir. 1974).]

*Accord, People v. Sanders, supra*, 86 Ill. App.3d at 465–66, 41 Ill.Dec. 461–62, 407 N.E.2d at 959–60 (period of time between dropping a charge due to lack of evidence and later indictment, upon securing testimony of codefendant, not chargeable to government).

Having determined that the trial court properly excluded from its speedy trial analysis the period of time between the original dismissal of charges and the later indictment, we turn to the intervals of time which should be considered in evaluating appellants' speedy trial claim. Four months elapsed between Michael Johnson's initial arrest and the dismissal; for Maurice Johnson, it was three months. The interval between appellants' subsequent indictment and trial was four months. Consequently, the total period of time (again, excluding the investigatory period) in Michael Johnson's case was eight months. For Maurice Johnson, it was seven months.

■ "In cases of a time lapse of less than a year, prejudice must be affirmatively demonstrated by a defendant." *Towles v. United States*, D.C.App., 428 A.2d 836, 841 (1981) (citations omitted). Appellants are unable to meet that burden. As the trial court found, there can be no legitimate objection to the brief intervals between appellants' first arrests and the dismissal of charges, and to the four-month interval between their indictment and trial. The latter period was necessary to insure fairness to both sides within the normal deliberative pace of the criminal justice system.

Nor was appellants' defense impaired, as they unpersuasively contend. In their original motion, appellants complained of the supposed unavailability of two witnesses. However, those witnesses were available at trial and were not called by the defense. Moreover, at appellants' behest, the trial court wisely refrained from ruling on their motion to dismiss before trial, choosing instead to wait until all the evidence had been presented in order to be able to assess properly the impact of the delay on appellants' defense. After careful evaluation, the court found that appellants' ability to present a defense had not been impaired. There was no error in the denial of their motion to dismiss the indictment on speedy trial grounds.

2. "... nor shall any person be subject for the same offence to be twice put in jeopardy of life

### III

■ In the course of its deliberations, the jury returned a partial verdict with respect to appellant Maurice Johnson, finding him guilty of robbery and not guilty of felony murder. Upon advising the trial court that it had reached no decision on the two remaining counts (second-degree murder while armed and armed robbery), the jury was instructed to resume deliberations until it could arrive at a unanimous verdict on those counts. Appellant moved for a mistrial on double jeopardy grounds, arguing that the jury's partial verdict on the lesser-included offense of robbery foreclosed further consideration of the charge of armed robbery. The motion having been denied by the trial court, appellant renews his argument on appeal. We find it to be without merit.

"The constitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." *United States v. DiFrancesco*, 449 U.S. 117, 127, 101 S.Ct. 426, 432, 66 L.Ed.2d 328 (1980), quoting *Green v. United States*, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). While appellant assuredly is entitled to the protection of the Double Jeopardy Clause[2] —and, where it applies, "its sweep is absolute," *Burks v. United States*, 437 U.S. 1, 11 n.6, 98 S.Ct. 2141, 2147 n.6, 57 L.Ed.2d 1 (1978)—it is clear that "the prohibition against multiple trials is the 'controlling constitutional principle.'" *United States v. DiFrancesco, supra*, 449 U.S. at 435, 101 S.Ct. at 435 (citations omitted).

At no time was appellant subjected to the hazards of a second trial. The jury's partial verdict reflected nothing more than a need for further deliberation on the remaining counts. That is, the jury's silence at that stage of its deliberations was not tantamount to an implied acquittal of the second-degree murder while armed and armed rob-

or limb...." U.S.Const. amend. V.

bery counts. *Cf. Green v. United States, supra* (where jury returned final verdict convicting defendant of second-degree murder while remaining silent as to the charge of first-degree murder, that silence was an implicit acquittal barring retrial on the greater charge). Such a result obtains only when a jury has been discharged. *Id.,* 355 U.S. at 188. 78 S.Ct. at 223. Until the jury in appellant's case had a full opportunity to return a verdict on the greater charge, its partial verdict on the lesser charge could not have triggered double jeopardy concerns. *See People v. Serrato,* 9 Cal.3d 753, 760, 512 P.2d 289, 294, 109 Cal.Rptr. 65, 70 (1973) (en banc).

Moreover, it appears that appellant acquiesced in the procedure followed by the trial court. In response to appellant's objection on double jeopardy grounds, the trial judge stated:

> Counsel agreed that we would send all counts to the jury. We would not tell the jury of the lesser included offense; however, if the jury indicated, as it has in the case of Mr. Michael Johnson, brought back both the robbery and armed robbery, we would throw out the robbery. Counsel agreed to that.

Consistent with that understanding, the jury verdict forms did not designate robbery as a lesser-included offense, nor did appellant request that the jury be instructed to consider robbery as a lesser-included offense only if it first determined to acquit on the greater offense. We see no error in the trial court's receiving the partial verdict and allowing the jury to resume deliberations on the remaining counts. *See United States v. Butler,* 147 U.S.App.D.C. 270, 272, 455 F.2d 1338, 1340 (1971) (where defendant makes no request that a lesser-included offense be considered by the jury only if it acquits on the greater, trial court may instruct jury to render verdicts on both counts).

**3.** Gross, who had dated Scott's brother for five years, was a close family friend, having known Scott since he was two years old.

**4.** The trial court should have given a limiting instruction after the statement was introduced, but no such instruction was requested. The

## IV

Appellant Michael Johnson challenges the admission of a prior consistent statement made by the government's chief witness, Oscar Lee Scott, to a witness for the defense, Kathryn Mary Gross. On cross-examination, Gross testified that, some time after Scott's arrest, she visited him in jail.[3] The transcript then reflects the following:

> Q. What did he say, when you saw him at the jail?
>
> A. On one occasion, we were talking and he said something about Kat, he said, Kat, why isn't Tootsie [appellant] in here with me in jail?

In response to further questioning, and over defense objection, Gross testified that Scott told her "that he couldn't understand why Tootsie wasn't locked up" and that he was not "taking the rap by [him]self." The trial court ruled that this hearsay testimony was admissible as a prior consistent statement since it substantially comported with the declarant's testimony at trial. The court did not err in its ruling.[4]

It is, of course, well established that prior consistent statements may not be used to support the testimony of an unimpeached witness. *Rease v. United States,* D.C.App., 403 A.2d 322, 327 (1979); *Tibbs v. United States,* D.C.App., 359 A.2d 13, 16 (1976); *Copes v. United States,* 120 U.S. App.D.C. 234, 236 n.3, 345 F.2d 723, 725 n.3 (1964). However, there is "the corollary principle that a prior consistent statement . . . may be introduced into evidence to rehabilitate a witness." *United States v. Smith,* 160 U.S.App.D.C. 221, 225, 490 F.2d 789, 793 (1974) (footnote omitted). Such rehabilitation is permissible when the witness' credibility has been challenged, *Rease v. United States, supra,* 403 A.2d at 328 n.7, whether by impeachment with a prior in-

court's oversight was not plain error. *United States v. Alexander,* 139 U.S.App.D.C. 163, 164 n.1, 430 F.2d 904, 905 n.1 (1970); *Copes v. United States,* 120 U.S.App.D.C. 234, 345 F.2d 723, 727 (1964).

consistent statement or by implication that the witness has a motive to lie. *United States v. Sampol*, 204 U.S.App.D.C. 400, 401, 636 F.2d 621, 672–73 (1980); *Copes v. United States, supra,* 120 U.S.App.D.C. at 235–36, 345 F.2d at 724–25.

Both circumstances existed in this case. Scott was impeached with the prior inconsistent statement he gave to the police three days before his arrest. In it, before he gave a written statement at the time of his arrest which was consistent with his trial testimony, he denied any knowledge of the circumstances surrounding Robinson's death because, as he said at trial, he "didn't want to get involved." In fact, the entire defense centered on challenging Scott's credibility. Consequently, "testimony [reflecting a prior consistent statement] was plainly relevant and proper to an evaluation of the credibility of the . . . witness which was under attack." *Copes v. United States, supra,* 120 U.S.App.D.C. at 236, 345 F.2d at 725.

Moreover, on cross-examination appellants tried to establish Scott's motive for lying—namely, that Scott had not been sentenced yet and may have hoped for leniency in exchange for cooperation with the government. "At first blush it might appear that one who accepts a plea bargain, on the condition of testifying in the prosecution of others, would have a motive to invent a case against the others." *United States v. Sampol, supra,* 204 U.S.App.D.C. at 400, 636 F.2d at 672. But this argument overlooks the nature of Scott's admissions to the police when he was arrested, in which he implicated himself in Robinson's death

one year before he agreed to testify against appellants. It also disregards the degree of culpability which he acknowledged by pleading guilty to second-degree murder. Furthermore, the charge of fabrication fails to take into account whether Scott had a motive to lie to the particular person to whom he made the statement. The challenged statements were made to Kathryn Mary Gross, a longtime acquaintance who was visiting Scott in jail. Gross did not represent the government and Scott was not bargaining with her.[5] Significantly, appellant does not challenge the admission of Scott's prior written consistent statement to the police or the admission of a similar prior consistent statement to a government witness.[6] In light of the number of prior inconsistent statements attributed to Scott which appellants placed before the jury, along with the implication that the witness had a motive to lie, the government was "clearly entitled to introduce [Scott's] statement that was consistent with his trial testimony to rebut the charge of fabrication, improper influence and motive. The prior consistent statement was 'of clear help to the factfinder in determining whether the witness [was] truthful.'" *United States v. Sampol, supra,* 204 U.S.App.D.C. at 401, 636 F.2d at 673 (citation omitted); *see also Rease v. United States, supra,* 403 A.2d at 327.

## V

Finally, appellant Michael Johnson argues that the evidence against him is insufficient to sustain his conviction of armed robbery. He contends that even viewing the evidence in the light most favorable to

**5.** Nowhere does the record reflect whether Scott's conversation with Gross when he was in jail occurred before or after his decision to plead guilty, that is, before or after his alleged motive to fabricate arose. We conclude that Scott had no apparent motive to lie to that particular witness, and deem this gap in the record to be immaterial. Likewise, we reject any negative implication arising from the fact that Scott's initial denial of involvement in Robinson's murder predated his challenged statements to Gross implicating appellant. "There is no requirement that the prior consistent statement have been made before the prior inconsistent statement." *United States v. Sam-*

*pol, supra,* 204 U.S.App.D.C. at 400 n.46, 636 F.2d at 672 n.46; *accord, Copes v. United States, supra,* 120 U.S.App.D.C. at 237, 345 F.2d at 726.

**6.** On redirect examination, Debra Cabbell, Scott's girl friend, was questioned as follows:

Q. Did he [Scott] ever tell you, when you visited him in jail or at any other time prior to him even being arrested, did he tell you that he wasn't going to take the beef for something he didn't do?

A. Yes.

the government, *see McEachin v. United States,* D.C.App., 432 A.2d 1212, 1218 (1981), at most the evidence shows that he was present when Robinson was killed but that he never associated himself with the assault that preceded the robbery. Hence, he argues, his conviction of armed robbery cannot stand.

Appellant's attempt to portray himself as a mere bystander to the assault is unavailing. "If a defendant is present at the scene of a crime without opposing or disapproving the acts, the trier of fact can, in consideration of all the circumstances, infer that he has consented to those acts, and has aided and abetted them." *People v. Fuller,* 91 Ill.App.3d 922, 928, 47 Ill.Dec. 497, 503, 415 N.E.2d 502, 508 (1980) (citation omitted). The circumstances of this case amply support a finding of guilt on an aiding and abetting theory. The evidence established that appellant: (1) told his brother that Robinson had $60; (2) stayed with Robinson while Maurice Johnson went to get the pipe; (3) stayed in the room with Robinson during the assault, although Scott momentarily fled the scene; (4) assisted Maurice in rolling the victim off the couch and searching his pockets for money; (5) took a third of the proceeds; (6) directed Scott to dispose of his (appellant's) bloodied pants; and (7) fled the scene after changing his clothes. Although mere presence at the scene of a crime will not sustain a conviction as an aider and abettor, "presence which 'designedly encourages the perpetrator, facilitates the unlawful deed ... or ... stimulates others to render assistance to the criminal act' will support a conviction." *Glass v. United States,* D.C.App., 395 A.2d 796, 806 (1978), quoting *Creek v. United States,* D.C.App., 324 A.2d 688, 689 (1974); *accord, Harris v. United States,* D.C.App., 377 A.2d 34, 37 (1977).

Appellant need not necessarily have intended the particular crime which was committed by the principal in order to be liable for what occurred. *Hackney v. United States,* D.C.App., 389 A.2d 1336, 1342 (1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979). It is incon-

sequential that appellant's active participation in the robbery may have been after the armed part of it had occurred. The acts described above support the jury's inference of appellant's "approving presence at the scene of the crime. Additionally, the defendant's assistance *during* the crime can be inferred from his acts performed with the other party *after* the commission of the crime." *People v. Fuller, supra,* 91 Ill. App.3d at 927, 47 Ill.Dec. 502, 415 N.E.2d at 507 (citations omitted) (emphasis in original). The trial court did not err in denying appellant's motions for a judgment of acquittal.

*Affirmed.*