THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
FRANCIS A. MITCHELL, Defendant-Appellant.

First District (2nd Division)    No. 80-776

Opinion filed March 3, 1981.—Rehearing denied May 19, 1981.

Julius Lucius Echeles, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Defendant, Francis A. Mitchell, was indicted for the murder of his former mother-in-law, Frances Krecji. After a bench trial in the Circuit Court of Cook County, defendant was convicted of murder and sentenced to a term of imprisonment of not less than 35 years nor more than 75 years.

On appeal, defendant raises the following issues: (1) whether he was denied his statutory or constitutional right to a speedy trial; (2) whether the evidence proved him guilty of the murder beyond a reasonable doubt; (3) whether the trial court improperly considered evidence of another crime; (4) whether the length of the sentence was inappropriate; and (5) whether this court erred earlier in reversing the trial court's order quashing a search warrant and suppressing the evidence procured thereunder.

For the sake of brevity and convenience, the chronological facts which relate to defendant's speedy trial argument will be set forth below in the discussion of that contention. Testimony produced at trial will be set forth here.

On June 9, 1973, Frances Krecji (hereafter the victim) was found murdered in her Berwyn home. On that day, defendant was arrested in his Bartlett home and held for the crime.

Defendant's trial commenced on June 7, 1979. He waived his right to be tried by a jury. The State's first three witnesses were Berwyn police officers involved in the case. Officers Michael Oschner and Marvin Ahr, riding in separate squad cars, were directed to the Krecji home at 3622 S. Cuyler in Berwyn by radio call on June 9, 1973. At the scene, the policemen were met by a friend of the victim who had been unable to contact her. The officers found the house to be secured. All windows and doors were locked, with the exception of a partially open window covered by a screen. The Berwyn Fire Department was called for assistance in gaining entry into the house.

A fireman entered the home through the open window by cutting through the screen. He told the officers that the victim was in the house, and let the officers in the front door. The victim's body was found lying on the floor, partially down a stairwell. The victim had several severe wounds to her head and face. The body was lying in a pool of blood, and blood was spattered on the walls. There were no apparent signs of a struggle, nor was there any indication of forced entry into the house. No weapon was found.

While at the house, Ahr answered the phone. The caller identified herself as the victim's daughter, calling from Florida. Ahr was given the name and address of defendant. He called the police department in defendant's village of Bartlett and requested that defendant be arrested.

Berwyn Police Officer Warren Trucksa was sent to the Bartlett station after defendant was taken into custody. He advised defendant of his *Miranda* rights, and informed him that he was being held in relation to the Berwyn homicide as well as the attack in Florida upon defendant's former wife and father-in-law. Defendant told Trucksa that he was in bed

at the time and could not have committed the crime. Trucksa noted that defendant had bruises and small cuts on his hands and arms. Defendant was taken to the Berwyn police station and processed.

Officer Oschner took the victim's body to the hospital. He then proceeded to the Du Page County courthouse, where he was joined by Officer Trucksa and several other policemen from Berwyn and Bartlett. A search warrant for defendant's house was procured. Forced entry was made into the building. The garage contained a 1973 Ford auto. Oschner and Trucksa each noticed blood stains on the car's front seat. Later analysis of these stains showed them to be of the same type blood as the victim, as well as of defendant's former wife. In the house, Trucksa found some clothing and a desk calendar with writing on it. These items were seized.

On the following day, Trucksa transported defendant to the hospital for treatment of the cuts on his hands. Defendant stated that they occurred when he was cutting his lawn with a sickle.

Dr. Edward Shalgous testified that he supervised the autopsy of the victim. She had suffered four distinct blows to the head. The injuries were forcefully caused by a heavy-type object. They were of a type compatible with heavy hammer blows. The autopsy was conducted on the afternoon of June 9, 1973. The victim had died at least 16 and possibly 24 hours prior to autopsy.

Mary Ann Smith, a friend of defendant's former wife, testified to a conversation with defendant held in September 1972. Defendant regretted having been separated from his wife. (At that time they were reconciled.) Defendant told the witness that the victim was the cause of his marital problems. He stated that anyone who interfered in his marriage in the future would be killed by him. Several weeks later, the witness talked with defendant by phone. He was again separated from his wife. He became very emotional and blamed the problems on the victim.

The victim's daughter-in-law testified that in late April or early May 1973, defendant made an unexpected visit to her house. Defendant was divorced from his wife. He told the witness that the divorce had broken his heart. He blamed the victim for causing his marriage to fall apart.

The daughter-in-law last saw the victim alive on June 7, 1973. The next day she was unable to contact the victim. Early in the morning of June 9, 1973, the witness received a call from the victim's daughter, defendant's former wife. After the call, the witness and her husband drove to the Berwyn home. They received no answer to their knocks, and found all the doors locked. Later in the day, the witness called the Berwyn home. A police officer answered and told the witness that the victim was dead.

On cross-examination, the daughter-in-law related an incident told to her by defendant in which the victim refused to allow defendant into her house to visit his child. The victim never allowed defendant into the house following the divorce.

Mildred Mitchell, former wife of defendant and daughter of the victim, testified that she had married defendant in March 1961. They had a son on May 27, 1972. In June 1972, she left defendant for a week and lived with her parents in Berwyn. In September 1972, she spent the month at her parents' new home in Florida. In mid-October 1972, she left defendant and lived with her parents in Berwyn.

Mitchell received calls from defendant after leaving him. He was angry and accused the victim of causing the separation. When the witness returned to her former home to pick up some belongings, she found the locks changed. A key to her parents' Berwyn home may have been left behind by her in defendant's house.

In December 1972, the witness moved to Florida with her parents. She sent defendant drawings, floor plans, and pictures of the house. In April 1973, defendant came to Florida. He attempted to talk his way into the house but was unsuccessful. Defendant later phoned and asked about the sleeping arrangements in the house. The witness explained them to the defendant.

In mid-April 1973, the victim returned to Berwyn to sell the house there.

On June 9, 1973, Mitchell was awakened in the Florida house, being beaten on the head. She ran from the assailant and saw her father leaning against a window with blood running down his head. At that point, she saw that the assailant was defendant. He was wearing gloves and was carrying a "shiny hammer." The witness ran outdoors and defendant fled.

Later, when Mitchell returned to the house, she called the Berwyn home. There was no answer. She called her brother in North Riverside and also called defendant's home in Bartlett. The witness next called the Berwyn police and asked them to check on the victim. Later, she again called the Berwyn house. A policeman answered. The witness told him of the Florida attack, stated that defendant had killed her mother, and gave the police defendant's name and address.

Mitchell identified the calendar seized from defendant's home as belonging to him. She stated that defendant was always making notes to himself, writing one for practically every action he took. She identified his writing on pages of the calendar.

Neighbors of the Krecjis in Florida also testified concerning the events of June 9, 1973.

Paul Moore related that he was the owner and operator of a taxi

company. Moore had received calls and visits from a man he identified as defendant, concerning transportation from defendant's home to O'Hare airport. June 8, 1973, was finally settled upon by defendant for the trip. In the late afternoon, Moore picked up defendant at his home. On the drive to O'Hare, defendant asked Moore if one could buy an airline ticket without identification. At the airport, defendant was dropped off at the Northwest Orient terminal. He asked Moore to wait 10 minutes in case he was unable to buy a ticket. When defendant did not appear. Moore left.

The final witness was Maureen Casey, a documents examiner for the Chicago Police Department. She had examined the desk calendar. Writings visible on certain pages therein were stipulated to be those of defendant. Other "indented" writings, which resulted from writings done on another page placed on the "indented" page, were identified as having been made by defendant. The witness was able to identify some of the "indented" writings. Among them were:

"Next get to killing of everyone, but the baby."

"Get over quickly."

"Place anonymous phone call to M."

"Until you next reach them. This is *very* important.

If you fly, call at each layaway. If you still get no answer, call from O'Hare direct * * *."

The writings were made readable in part by the witness' use of red ink on the pages.

The State rested after this witness. The defense presented no evidence. The court convicted defendant of murder.

At the sentencing hearing, the trial court was presented with factors in aggravation and mitigation. After considering these factors, the court sentenced defendant to a term of not less than 35 nor more than 75 years.

I.

Defendant contends that he was denied both his statutory and constitutional speedy-trial rights during the six-year period between his initial arrest and the commencement of trial.

A.

Defendant was arrested on June 9, 1973. Sixty-one days later, on August 9, a Cook County grand jury returned a No Bill on the murder charge. Prior to that date, Florida had filed a detainer on defendant in connection with battery charges arising out of the incident involving defendant's former wife and father-in-law. Defendant thus remained in custody in Cook County after August 9 on the basis of the detainer, while

there were no Illinois charges pending against him after that date. He was released on bail on October 10, 1973.

In Florida, defendant entered a guilty plea on the battery charges and was imprisoned. Meanwhile, another Cook County grand jury returned an indictment of defendant for murder on December 20, 1974. This indictment contained a technical error and was superseded by a corrected indictment issued January 31, 1975.

On March 11, 1975, the State of Florida offered to deliver temporary custody of defendant to Illinois for trial on the murder charge. In early May, defendant returned to Illinois. He was arraigned on May 26, 1975, at which point the case was continued by agreement.

On April 6, 1976, defendant filed a motion for discharge based upon speedy-trial grounds. The motion alleged that defendant's speedy-trial right was violated in 1973 when he was held in custody without trial from June 9 to October 10, a period of more than 120 days. This motion was denied, and defendant does not reargue its merits here. Later, another motion to discharge based upon speedy-trial grounds was filed. This motion alleged that defendant should have received credit for 61 days of a speedy-trial term for the period of custody which occurred in 1973 (covering June 9 to August 9). The motion additionally alleged that this term began to run again on day 62 when defendant "filed a request for trial" (the Florida offer of delivery). According to the reasoning of the motion's argument, defendant was then denied his right to speedy trial when the next delay occasioned by him did not occur until 137 days into the term, on May 26, 1973, when he agreed to a continuance after arraignment. The trial court denied the merits of this motion. The argument contained in the second motion is reiterated by defendant to this court.

The speedy-trial statute in part provides that "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant, * * *." (Ill. Rev. Stat. 1979, ch. 38, par. 103—5(a).) A term under this provision began to run when defendant was taken into custody on June 9, 1973. Upon return of the No Bill by the grand jury, defendant was no longer in custody on any pending Illinois charges. Thus, the speedy-trial term was no longer operative. The issue, of course, is whether the 61 days which had accrued on the term up to that point were erased by the return of the No Bill, or whether the term was merely suspended by this circumstance, as argued by defendant.

No cases cited by either party address this exact issue. *People v. Sanders* (1980), 86 Ill. App. 3d 457, 407 N.E.2d 951, involves a somewhat

similar set of circumstances. In *Sanders*, a speedy-trial claim arose after the State procured a *nolle prosequi* of the charges during the term. The court examined three types of situations in which charges are dismissed and later reinstated, and the effect such dispositions have upon the speedy trial rights of the defendant. The situations included (1) a finding of no probable cause at a preliminary hearing, (2) an SOL (striking of the charges with leave to reinstate), and (3) a *nolle prosequi*. The court noted that in the first situation, the time which has elapsed on a speedy-trial term prior to the finding of no probable cause is erased upon that finding, absent a showing that the State purposely secured that finding as a dilatory tactic. In contrast, the term continues to run when the State procures an SOL, since in that situation the charges lie in a "dormant" state and may be resurrected at any time on a motion of the State; further, the SOL itself is a product of the State's own act. The court held that, in the situation involving a *nolle prosequi*, the term continues to run if the defendant is held in custody or on bond or recognizance, but is tolled in situations in which defendant is free to go.

■■ We find the present circumstances to be most analogous to a finding of no probable cause. The latter finding involves an independent judicial determination which, absent a showing to the contrary, is presumptively free of prosecutorial manipulation. Similarly, return of a No Bill by a grand jury is an independent action which is presumptively free from prosecutorial manipulation. Of course, a showing to the contrary may also be made in this situation. However, absent such a showing, the speedy-trial term ceases to run upon return of the grand jury's decision, and a wholly new term commences to run if the defendant is later indicted.

■■ We have been presented with nothing in the record which is sufficient to overcome the presumption that the grand jury's return of the No Bill was an independent act. There is no evidence that the State procured this finding as a dilatory tactic. Thus, the 61 days of the term which elapsed in 1973 must be considered erased upon return of the No Bill, which left no Illinois charges pending against defendant.

■■■ As a result, a new speedy-trial term began to run at some point in 1975. For the purposes of the speedy-trial statute, the defendant must be in the custody of the State (or on bail or recognizance) before such a term can begin to run. (Ill. Rev. Stat. 1979, ch. 38, par. 103—5(a)(b); *People v. Sanders* (1980), 86 Ill. App. 3d 457, 466.) Defendant was not under Illinois custody here until sometime in May 1975, notwithstanding his "request for trial" from Florida sent March 11, 1975. On May 26, 1975, the case was continued by agreement. This is a delay occasioned by defendant. Under the speedy-trial statute, for crimes committed prior to March 1, 1977, any such delay tolls the term and causes a wholly new term to commence on

the date to which the case is continued. *(People v. Donalson* (1976), 64 Ill. 2d 536, 540, 356 N.E.2d 776.) Therefore, the term which commenced upon defendant's return to Illinois custody sometime in May 1975 was tolled on May 26. No speedy-trial violation occurred up to this date, and the trial court correctly denied defendant's motion concerning this time period.

Defendant's brief confuses the speedy-trial provisions of the Uniform Agreement on Detainers (Ill. Rev. Stat. 1979, ch. 38, par. 1003—8—9, art. III(a)) in making this argument.[1] Under that statute, a defendant in the custody of another State who has charges pending against him in Illinois must be brought to trial in Illinois within 180 days of the time he causes to be delivered written notice of his place of imprisonment and a request to be tried. Here, Florida forwarded an offer to remit defendant for trial on March 11, 1975. While it may be debated whether this is the type of notice envisioned by the detainer statute, resolution of that question is not crucial to a determination of defendant's speedy-trial claim thereunder. As noted, defendant's case was continued at his behest (in part) on May 26, 1975. Clearly, 180 days had not then passed since the previous March 11. Thus, no violation of the speedy trial provision of the detainer statute is present.[2]

### B.

On October 7, 1976, defendant demanded trial. He states that this date serves as the beginning of the speedy-trial term for the purposes of his second speedy-trial argument. On January 5, 1977, defendant filed a motion to quash the search warrant for his home and to suppress evidence seized thereunder. On January 12, 1977, the trial court granted this motion. The State appealed that finding on January 17. The third division of this court reversed the trial court on May 31, 1978. *(People v. Mitchell* (1978), 61 Ill. App. 3d 99, 377 N.E.2d 1073.) Defendant filed a petition for leave to appeal with the supreme court. This petition was denied. (71 Ill. 2d 612.) The mandate from this court issued on October 31, 1978, and was received by the circuit court on November 6, 1978.

On February 14, 1979, defendant filed a motion to discharge under the speedy-trial statute. The argument asserted here is that the filing of the motion to quash *suspended* the term under the statute, but did not *vacate* it. Defendant alleges that 85 days were already on the term (covering October 7, 1976, to January 5, 1977) when the case was redocketed in the

---

[1] Defendant states that "the question is currently open in this state as to whether pre-trial delays while the defendant has a pending Illinois charge, but is in custody of another state, can be included in the term ° ° ° under section 103—5." A careful reading of the statute demonstrates, as noted above, that a defendant must be in custody in Illinois before section 103—5 is applicable.

[2] Compare *People v. Holleman* (1980), 82 Ill. App. 3d 409, 402 N.E.2d 784.

circuit court on November 6, 1978. According to this argument, the term began running again on that date, at day 86. When the motion to discharge was filed on February 14, 1979, the term would have been at day 185, under defendant's reasoning. This, he alleges, was a violation of his speedy-trial right.

■■ Defendant cites *Donalson* in support of this argument. However, *Donalson* defeats defendant's contention. That case holds, for crimes committed prior to March 1, 1977, that any delay caused by defendant serves to *vacate*, not suspend, the speedy-trial term. We note that on January 12, 1977, defendant supplemented the motion to quash with an amended motion to dismiss based on discovery grounds. We find that the combination of these motions constituted a delay attributable to defendant. Thus, defendant's motions erased the accumulated 85 days. On November 6, 1978, the term started to run anew. Defendant was out on bail at that time, so that the State was given 160 days to bring him to trial. (Ill. Rev. Stat. 1977, ch. 38, par. 103—5(b).) This term had not run by February 14, 1979. Defendant's statutory speedy-trial rights were not violated during this time period.

## C.

Defendant contends that the overall length of time between his initial arrest and the date that trial finally began violated his constitutional right (U.S. Const., amend. 6) to a speedy trial.

■■ The United States Supreme Court has held that it is impossible to determine with precision when the constitutional right to a speedy trial has been denied. Inquiry into a speedy-trial claim must necessarily involve a functional analysis, made in the context of each particular case. The factors to be considered include the length of the delay, the reasons for it, the presence of a defendant's assertion of the right, and the type of prejudice caused by the delay. (*Barker v. Wingo* (1972), 407 U.S. 514, 521, 530, 33 L. Ed. 2d 101, 92 S. Ct. 2182.) Compliance with the speedy-trial statute usually precludes the possibility of a violation of the constitutional right, since the latter protects against only arbitrary and oppressive delay. *People v. Nowak* (1970), 45 Ill. 2d 158, 161, 258 N.E.2d 313.

Here, defendant spent six years between the initial arrest for the murder and the commencement of trial. However, this lengthy span cannot be viewed as a single block of time. Rather, the particular context of that period must be examined.

From August 9, 1973, to December 20, 1974, there were no charges pending against defendant in Illinois. Defendant calls the State's activity during this period an unreasonable failure to secure an indictment. The State admits that the record is unclear as to what transpired during this

period, but asserts that the State was using the time to continue its investigation in order to accrue additional evidence to present to a grand jury.

■■ The constitutional speedy-trial protections are not available to one not yet accused of a crime, nor do they require the State to discover, investigate, and accuse a person within a particular period of time. It is either formal indictment or information or else the actual constraints imposed by arrest and holding to answer a criminal charge that engage the constitutional speedy-trial protections. (*United States v. Marion* (1971), 404 U.S. 307, 313, 320, 30 L. Ed. 2d 468, 92 S. Ct. 455.) Here, although defendant was in fact arrested for the crime of murder of which he was eventually convicted, that arrest did not lead either to an indictment or conviction, since a grand jury returned a No Bill. During the period in question, defendant was effectively free from the type of constraints which we believe the Supreme Court envisioned in setting forth the *Marion* holding. (See *People v. Toney* (1978), 58 Ill. App. 3d 364, 374 N.E.2d 695, *appeal denied* (1978), 71 Ill. 2d 605; compare *Dillingham v. United States* (1975), 423 U.S. 64, 46 L. Ed. 2d 205, 96 S. Ct. 303.) Defendant provides nothing of substance either in evidence or in case law to buttress his claim that the delay under consideration served to prejudice those interests which have been identified as the bases for the speedy-trial protection found in the Constitution. (See *United States v. Marion* (1971), 404 U.S. 307, 320, 30 L. Ed. 2d 468, 478, 92 S. Ct. 455, 463.) We therefore find that there was no violation of defendant's constitutional speedy-trial right during the 1973-74 period.

The next major period of delay covers the time from defendant's arraignment in Illinois on May 26, 1975, until his filing of the motion to quash in January 1977. During the majority of that time, until October 7, 1976, defendant either agreed to or himself requested continuances. As previously noted, he demanded trial on the latter date. However, before the statutory speedy-trial term starting then had expired, defendant filed the motion to quash. The ensuing proceedings covered the period of January 1977 to November 6, 1978. None of this time can be attributed to the State's actions. Thus, no constitutional violation resulted there.

The State was responsible for delays from November 1978 to February 1979. However, this period was not of sufficient length to violate the statutory speedy-trial term. The remaining period of time prior to trial involved delays caused as much by defendant as the State. No violation of rights is assignable to this time frame.

■■ Clearly, the amount of time involved in this case is unfortunate. Nonetheless, the peculiar facts of the case, including the out-of-State conviction of defendant, the lengthy interlocutory appeal, and defend-

ant's own dilatory actions preclude a finding of a violation of the constitutional speedy-trial protection. Defendant has no valid grounds in the record to demand discharge based on his speedy-trial rights.

## II.

Defendant contends that he was not proved guilty of murder beyond a reasonable doubt.

■■ The evidence presented at trial which linked defendant to the crime was entirely circumstantial. A conviction for murder may be based solely upon circumstantial evidence so long as that evidence eliminates every reasonable hypothesis of innocence. The evidence must be of a conclusive nature and lead on the whole to a satisfactory conclusion which produces a reasonable and moral certainty that the accused, and no one else, committed the crime. (*People v. Hayes* (1979), 70 Ill. App. 3d 811, 820, 388 N.E.2d 818, *appeal denied* (1979), 79 Ill. 2d 614.) It is for the trier of fact to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence. (*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733.) This court will not reverse such determinations unless the evidence raises a reasonable doubt as to the guilt of the defendant.

The evidence presented at trial has been summarized above and will not be repeated here. The assertions made in defendant's brief concerning various evidentiary matters are nothing more than a reargument of the case presented below. Nothing contained in those assertions raises a reasonable doubt as to defendant's guilt. A careful examination of the record as a whole and of each individual's testimony demonstrates that the decision of the trier of fact as to defendant's guilt beyond a reasonable doubt is supported by the record.

## III.

Defendant contends that the trial court improperly considered evidence of the crime of battery he committed upon his former wife and father-in-law in Florida.

■■ Generally, evidence of crimes other than that with which the defendant is charged is inadmissible. There are, however, certain well-established exceptions to this rule. Evidence which goes to show motive, intent, absence of mistake, or *modus operandi* is admissible despite the fact that it may show the commission of a separate crime by the defendant. (*People v. Kavinsky* (1980), 91 Ill. App. 3d 784, 796.) This is true even where the other crime is committed subsequent to that for which

defendant is on trial. *People v. Campbell* (1975), 28 Ill. App. 3d 480, 489, 328 N.E.2d 608.[3]

■■ Here, the similarity of the attack in Florida with the results in Berwyn brings the evidence of the former crime within the purview of *modus operandi*. Defendant errs when he asserts that the only purpose for considering evidence of the former crime here is to show identity. Thus, the evidence which is disputed here was admissible. The trial court made no error in considering it.

## IV.

Defendant contends that the trial court erred in entering the sentence which it gave to defendant.

■■ The standard of review of a sentence claimed to be excessive is whether in fact the trial court exercised its discretion and, if so, whether this discretion was abused. (*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541, which rejected the "rebuttable presumption" standard urged by defendant.) Here, defendant was found guilty of the brutal murder of his former mother-in-law. He chose to be sentenced under the "old" sentencing statute (Ill. Rev. Stat. 1977, ch. 38, par. 1005—8—1(b)(1)) which provided for any indeterminate term in excess of 14 years for a conviction of murder. The trial court was presented with numerous facts in aggravation and mitigation. The record indicates that the court carefully considered these factors in rendering sentence. We can find nothing in the record to demonstrate that the trial court abused its discretion. Thus, this court has no option under *Cox* but to affirm the sentence entered.

## V.

■■ Defendant contends that this court improperly reversed the trial court's order which quashed the search warrant and suppressed the evidence seized thereunder.

It is well settled that a judgment of a reviewing court is *res judicata* to all issues raised before it. Further, all issues which could have been raised, but were not, are deemed waived. (*People v. Willis* (1979), 79 Ill. App. 3d 617, 620, 398 N.E.2d 861.) Also, issues not raised in a motion to quash which relate thereto are not properly before this court and are forever

---

[3] Defendant appears not to be apprised of this rule. He cites this court to some general language contained in *People v. Chronister* (1942), 379 Ill. 617, 622-23, 41 N.E.2d 750, for the proposition that evidence of subsequent crimes is never admissible because it is contrary to the presumption of innocence. The supreme court later narrowed this holding with clarifying language in *People v. Lehman* (1955), 5 Ill. 2d 337, 343, 125 N.E.2d 506. Defendant's argument is therefore lacking in merit.

waived. (See *People v. Edwards* (1976), 35 Ill. App. 3d 807, 809, 342 N.E.2d 800.) In light of these principles, we find absolutely no merit in this contention of defendant.

For the foregoing reasons, the judgment and sentence of the trial court are affirmed.[4]

Affirmed.

HARTMAN, P. J., and STAMOS, J., concur.

---

[4] We do wish to make note of the following for the benefit of defense counsel here and of the practicing bar. Supreme Court Rule 342 provides that "[t]he appellant's brief shall include, as an appendix, ° ° ° a complete table of contents, with page references, of the record on appeal." (Ill. Rev. Stat. 1979, ch. 110A, par. 342(a).) The purpose of this rule is to assist the reviewing court in examining the record and assessing the merits of the appellant's contentions. Such an appendix is especially useful on a criminal appeal when a question as to whether a defendant was proved guilty beyond a reasonable doubt is raised. In this case, defendant's appellant's brief was wholly lacking in an appendix and was thus not in conformity with the rule. It is urged that greater attention be given to the directives of the rule in the future.