THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE
MARTINEZ, Defendant-Appellant.

First District (3rd Division)    No. 1—91—2903

Opinion filed June 15, 1994.

Dennis A. Giovannini and Herbert L. Goldberg, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Theodore F. Burtzos, and Barbara L. Jones, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE TULLY delivered the opinion of the court:

Following a jury trial, defendant, Jose "Tony" Martinez, was convicted of solicitation of murder for hire and attempted first degree murder and was sentenced to 40 years' imprisonment for solicitation of murder for hire and an extended term of 50 years' imprisonment for attempted first degree murder, the sentences to run consecutively. Defendant appeals to this court from the judgment of conviction pursuant to Supreme Court Rule 603 (134 Ill. 2d R. 603).

On appeal, defendant contends that: (1) the trial court erred in denying his motion for discharge pursuant to section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 103—5); (2) the trial court abused its discretion in denying his motion *in limine* regarding a videotape of the victim; (3) the trial court abused its discretion in allowing the State to present evidence regarding his motive where the State allegedly failed to establish his knowledge of the acts which allegedly constituted that motive; (4) the prosecution made improper comments that denied him a fair trial; (5) the trial court improperly entered convictions and sentences upon him; (6) the State failed to prove defendant guilty beyond a reason-

able doubt; and (7) the trial court improperly refused to allow certain evidence to go the jury room.

For the reasons which follow, we affirm.

## FACTUAL BACKGROUND

The following pertinent facts were adduced at trial. In December 1989, Orelia "Lia" Turner, the victim, was four months pregnant with defendant's child. In the early part of 1989, Turner was living with defendant. Miguel "Tito" Ramos testified that he visited defendant at Cook County jail along with his girl friend, Martha Torres. Defendant told them that he needed his girl friend "knocked off" because she had "tricked" on him. Ramos interpreted this to mean that defendant wanted Turner killed because she was testifying against him in the murder case of defendant's brother-in-law, Anton Crespo. Defendant was incarcerated in the Cook County jail at that time for the Crespo killing. Martinez said he was willing to pay $20,000, a Chevrolet Corvette and a Chevrolet Blazer to have Turner killed.

Ramos and Torres then went to the home of Lillian "Leo" Sanchez, the girl friend of Jose Contes. Ramos offered Contes $5,000 to fulfil the wishes of defendant. Martha Torres told Contes that "the guy in jail is good for it because he's a big time dope dealer." Ramos then contacted Luis "Chino" Cornier, who said that he could get a gun from a friend to carry out defendant's wishes. Ramos and Cornier saw a fellow member of a street gang to which they belonged, the "Spanish Cobras," on the street who gave them a gun. They returned to Contes' house and then drove to Sanchez' house, where they placed the gun in the trunk of Contes' car.

Turner and her friend, Karen Gallas, went to the house of Torres. When Ramos arrived, the women said they were going out to get nylons. Turner asked Ramos for his car keys so they could buy nylons. With the car keys, Turner and Gallas left the house. A few minutes later Gallas returned crying and said that Turner had been shot in the head.

Around 7 a.m. the next morning, Contes called Ramos to say the job was done and asked for his money. Ramos returned to Torres' house, where two police officers escorted them and Gallas to the police station. The police took Ramos with them to locate Contes' house. Ramos paged Contes and told him he had the money.

On cross-examination, Ramos stated where he went after the visit with defendant in jail. He did not put in his statement defendant's instructions regarding arranging a blind date and stripping Turner of her identification. Ramos stated that defendant

had told him that Turner was the one testifying against defendant and once she was out of the way he was going to win the Crespo case. Ramos also testified that he had been treated well by the police and that he was not threatened in any way.

Torres was pregnant with what Ramos believed to be his child. Ramos was shown defense photographs of Torres and Martinez in bed together. Ramos could not remember if he had seen the pictures prior to visiting defendant in jail.

Contes testified that he was currently incarcerated in a State penitentiary as a result of his having previously pled guilty to the attempted murder of Turner and was sentenced to 10 years' imprisonment for the crime. On December 15, 1989, at Sanchez' home, Ramos explained what defendant wanted. Contes was to be the driver and Turner's blind date. Ramos gave Contes a description of Turner. He confirmed that he would receive the money and cars from defendant. Contes suggested that his cousin Cornier would shoot Turner. Contes, Cornier and Ramos removed a .38 black snubnose gun from the trunk of Ramos' car and placed it in the trunk of Contes' car. Cornier grabbed the gun from the trunk and they followed Ramos to 1639 North Fairfield.

Contes stopped the car near an alley, parked and waited about 15 minutes. He heard a gunshot coming from Cornier's direction. Cornier returned to the car after shooting Turner and the two men drove to Sanchez' house. The next evening Contes contacted Ramos, who said that he had the money. Shortly thereafter, the police arrived at the house and arrested them.

Contes testified to all of the preceding facts. He also stated that he was a member of the Spanish Cobras and that there was a lot of hatred among rival gangs. Contes, his cousin Ramos, and Cornier were all members of the gang. Contes recounted that Torres had made plans for them to go to a night club and for Turner to be his blind date.

Ramos left the house and returned after 12 a.m. Turner asked Ramos to borrow his car in order to buy nylons. As they left the house, Turner approached the passenger side of the car when a man came out of the parking lot, grabbing her from the back of the head. Gallas testified that a man shot Turner in the back of the head. She ran to the house and told the people there that Turner had been shot. The police and an ambulance arrived and took Gallas and Turner to the hospital.

Officer Wiora recovered a .38-caliber, five-shot, bluesteel revolver with a defaced serial number, wrapped in a rag under the sink in Contes' apartment. Around 8 p.m., Ramos, Cornier and Contes were arrested together at 2107 North Pulaski.

Officer Ernest Halvorsen testified, over defense objection, that on a prior occasion he arrested defendant for the murder of Crespo. Also over defense objection he stated that he had spoken with Turner about the Crespo murder and had brought Turner before a grand jury on December 5, 1989. Halvorsen interviewed both Cornier and Contes. After the interview he checked the car of Contes and found four bullets in a baby shoe hanging from the rear view mirror. In Ramos' wallet was a picture of a white Chevy Blazer in which defendant had been arrested on December 4, 1989. Halvorsen was present while Ramos gave a statement before a court reporter. Halvorsen recounted that he gave Ramos every opportunity to say anything that he wanted to with regard to Turner's shooting.

Defendant testified that he was Turner's boyfriend for over a year and that she had been carrying his child. Defendant was affiliated with the "GBO" street gang and was familiar with its rival, the Spanish Cobras. Defendant identified photographs of Torres which had been taken a month prior to his arrest and which depicted him in a motel room with her. Defendant recalled that they had had sexual relations and the pictures showed the two of them in bed together. They had driven to the motel in his brother's white Blazer since he did not own a car.

On December 15, 1989, defendant was visited by Torres and Ramos. Defendant stated that he did not know Ramos. Defendant had spoken over the phone with Torres, who had asked him to tell Ramos there was no romantic liaison between her and defendant. Defendant testified that he did not ask Ramos to do anything regarding Turner.

In closing argument, the State argued that the motive for this case was defendant's desire to prevent Turner from testifying before the grand jury in the murder case of Crespo. This argument was allowed over the defense objection. The State also remarked on a videotape of Turner and "how sad it was." The court overruled defense objections to the fact that Turner's mother's heart was broken and that Turner "had been reduced to a wheelchair."

Subsequently, defendant was found guilty as charged and sentenced.

## OPINION

First, defendant argues that he was held beyond 120 days in violation of section 103—5 of the Code of Criminal Procedure (hereinafter section 103—5) (Ill. Rev. Stat. 1989, ch. 38, par. 103—5). We disagree.

Section 103—5 guarantees a criminal defendant in custody a

trial within 120 days of being taken into custody, unless defendant occasions the delay. When a delay is occasioned by the defendant, such time is not credited against the 120-day period. (*People v. Sanders* (1980), 86 Ill. App. 3d 457.) In addition, any continuance entered with the defendant's agreement is considered a delay occasioned by him and not counted towards the 120 days. (*People v. Mitchell* (1981), 95 Ill. App. 3d 779, 786.) Where a defendant is already in custody for an unrelated charge pending against him, the speedy-trial period begins with the date of indictment for the new offense. (*People v. Woodruff* (1980), 90 Ill. App. 3d 236, 239.) "Such person shall be tried upon all of the remaining charges thus pending within 160 days from the date on which judgment relative to the first charge thus prosecuted is rendered ***." (Ill. Rev. Stat. 1989, ch. 38, par. 103—5(e).) Section 1.11 of "An Act to revise the law in relation to the construction of statutes" provides:

> "The time within which any act provided by law is to be done shall be computed by excluding the first day and including the last, unless the last day is Saturday or Sunday or is a holiday as defined or fixed in any statute now or hereafter in force in this State, and then it shall also be excluded. If the day succeeding such Saturday, Sunday or holiday is also a holiday or a Saturday or Sunday then such succeeding day shall also be excluded." (Ill. Rev. Stat. 1989, ch. 1, par. 1012.)

In the case *sub judice*, the State ultimately elected not to pursue the Crespo murder case.

■ The indictment stemming from the attack on Turner was returned on January 29, 1990. Defendant was arraigned on February 8, 1990. From February 9, 1990, until February 25, 1991, the date defendant demanded trial on the Turner charges, the proceedings were continued either on defendant's motion or by agreement of the parties and, thus, such time is attributable to defendant. Consequently, only the 10 days, counting from the day after indictment through the date of arraignment, passed for the purposes of the 120-day period. Ill. Rev. Stat. 1989, ch. 1, par. 1012.

Defendant demanded trial on February 25, 1991, and occasioned no subsequent delays. Thus, the eleventh day of the 120-day period began on February 26, 1991, and the 120th day fell on Saturday, June 15, 1991. Since holidays, Saturdays and Sundays are not included in the computation of the last day of the 120-day period (*People v. Montenegro* (1990), 203 Ill. App. 3d 314, 316), the last possible date for trial to commence was Monday, June 17, 1991—the date trial began. Therefore, defendant was not denied a speedy trial and the trial court did not err in this regard.

Second, defendant posits that the 10-minute videotape of Turner was unduly prejudicial and, thus, improperly admitted into evidence. The State maintains the tape was probative of the permanence of Turner's injuries and of great bodily harm. It also demonstrated that defendant performed an act which constituted a substantial step towards the commission of first degree murder.

Whether a photograph or a videotape of a victim should be admitted into evidence rests within the sound discretion of the trial court. (*People v. Williams* (1983), 113 Ill. App. 3d 49.) Absent an abuse of such discretion, a court of review should defer to the trial court, regardless of whether it would have decided differently. (*People v. Fierer* (1988), 124 Ill. 2d 176.) In admitting the tape, the trial court stated:

> "The film demonstrates cognitive abilities or lack thereof. Manual dexterity and the appearance of the individual as such. *** I'm going to let this film be exhibited. *** It's my intention, however, to enter a cautionary instruction to the ladies and gentlemen of this jury."

It is established law that where photographs are relevant to establish any fact in issue, they are admissible in spite of the fact that they may be of a gruesome nature. See *People v. Foster* (1979), 76 Ill. 2d 365.

Prior to allowing the jury to view the tape, the trial court gave the following instructions:

> "Ladies and gentlemen of the jury, the videotape that you are about to see is offered for the very limited purpose of aiding you in deciding the issues of great bodily harm, if any, the nature and extent of permanency, if any, of the disabilities allegedly resulting from the injury inflicted on Orelia Turner.
>
> Sympathy, if any, that might be invoked is not to be considered by you in any way at all in ultimately arriving at your verdict or in arriving at your verdict in any way at all.
>
> Neither sympathy not prejudice is to be considered by you in arriving at your verdict and your verdict must be based on the law and the evidence only in this case."

■ In *People v. Abernathy* (1989), 189 Ill. App. 3d 292, a videotape which illustrated a witness' testimony regarding the victim's appearance on the night she was killed was admitted into evidence. The *Abernathy* court held that the tape, which was probative of identity, was admissible, even though the defendant did not refute the victim's identity. The *Abernathy* court further held that videotapes and photographs may be properly admitted to corroborate testimony despite the defendant's offer to stipulate to the matters therein. Similarly, in the case *sub judice*, even though Turner's

identity was not contested, the videotape was properly admitted to show her identity. Moreover, it was unlikely that the tape caused any more revulsion among the jurors than was already present by the facts of the case, *viz.*, this is a case of a man who ordered the murder of his girl friend, who was 16 weeks pregnant with his child. Finally, we believe that the videotape was properly admitted and was relevant to the issues of great bodily harm, permanent disability, identity and corroborated the testimony of a treating physician, Dr. David Brooks, in that it indicated the permanency and severity of the victim's injuries and the editing of the tape to 10 minutes in length greatly reduced any chance of prejudice to defendant. Accordingly, we find no error in the trial court's admitting the videotape into evidence.

Third, defendant maintains that the trial court improperly admitted evidence that a motive for defendant to attempt to murder Turner was the fact that she had testified against him in a previous murder charge. We find this line of argument to be completely vapid.

Defendant filed a motion *in limine* to prevent the State from arguing or presenting evidence that Turner was a witness against defendant on the unrelated Crespo murder charge and that she had testified before the grand jury. Although the trial court denied the motion, it directed the State not to comment upon the facts of the Crespo murder charge.

Defendant urges that in order to prove facts showing a motive, the State must prove that the accused knew of those facts. Unless the State was able to prove that defendant had knowledge of the grand jury appearance of Turner and knew that she was a witness against him, then the introduction of that evidence was irrelevant and its admission was highly prejudicial. (See *People v. Easley* (1992), 148 Ill. 2d 281; *People v. Parra* (1975), 35 Ill. App. 3d 240.) In the case at bar, the State presented ample testimonial evidence that defendant was well aware that the victim had testified before the grand jury against him and, consequently, there was no error in the trial court's ruling.

Fourth, defendant urges that the prosecution made improper comments which denied him a fair trial. Specifically, defendant argues that the State improperly questioned witnesses and argued to the jury irrelevant facts concerning the Crespo murder charge in an attempt to inflame the passions of the jury. We cannot agree.

Evidence of other crimes, while not admissible to show the propensity to commit crimes, is admissible to show motive. (*People v. Stewart* (1984), 105 Ill. 2d 22.) Evidentiary rulings of this kind will not be reversed absent a clear abuse of discretion. *People v. Saunders* (1991), 220 Ill. App. 3d 647.

■ In *People v. Wooten* (1990), 198 Ill. App. 3d 591, the prosecution showed that the defendant was the subject of a grand jury investigation and that the victim was to be a witness against him. This evidence of the other pending charge was held to be proper by the *Wooten* court, as it tended to show a motive for the defendant murdering the victim. Similarly, in the instant case, Ramos' testimony that he and Torres visited defendant in jail where he proposed the murder of Turner tends to show the awareness by defendant of his grievance against Turner and is relevant to establish motive and, thus, was properly admitted as such evidence is probative to the issue of defendant's guilt. With regard to defendant's position that the prosecution made improper remarks, we find this line of argument so devoid of any merit as to warrant no further comment.

Fifth, defendant assigns error to the trial court's entry of judgment of convictions and consecutive sentences upon him for the offenses of attempted first degree murder and solicitation of murder for hire, where both offenses were predicated solely on a single act of solicitation. We do not think this is so.

A trial court's sentencing decisions are entitled to great deference and weight. A sentence may be altered on review only where this discretion has been abused. (*People v. Streit* (1991), 142 Ill. 2d 13.) The Illinois Supreme Court has held that accountability (Ill. Rev. Stat. 1989, ch. 38, par. 5—2) and solicitation (Ill. Rev. Stat. 1989, ch. 38, par. 8—1) relate to different conduct and as a consequence entail different elements of proof. *People v. Crews* (1989), 191 Ill. App. 3d 228.

■ In the case *sub judice*, defendant asked Ramos to kill Turner during a jail visit. Defendant told Ramos that he would give him $20,000 and two vehicles in return. Ramos then told Contes and Cornier of the offer. Cornier said he would do it. At this point defendant was guilty of solicitation of murder for hire as he intended that the offense of first degree murder be committed and procured the services of others to commit that offense pursuant to a contract, agreement, understanding, command or request for money or anything of value (Ill. Rev. Stat. 1989, ch. 38, par. 8—1.2.), *viz.*, the cash and vehicles.

Defendant was independently found guilty of attempted first degree murder on an accountability theory. A person is legally accountable for the actions of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c).) Defendant aided and abetted

in the plan to murder Turner when he gave Ramos a telephone number which Ramos was to call in the event Ramos could not locate a gun.

Accordingly, we find defendant was properly sentenced to two consecutive sentences, 40 years for the solicitation of murder and 50 years for the offense of attempted first degree murder. Both crimes mandated a substantial change in the nature of a defendant's criminal objective. Additionally, defendant's conduct falls within the statutory exception for attempted murder, a Class X felony, where severe bodily harm was inflicted upon Turner. (See *People v. Sangster* (1982), 91 Ill. 2d 260.) In such a case, a trial court may impose consecutive sentences in order to protect the public from harm.

Sixth, defendant submits that he was not found guilty beyond a reasonable doubt. Specifically, defendant challenges the credibility of Ramos' testimony. Defendant states that Ramos had filed perjured documents with the trial court. Ramos was a member of a rival gang and he also allegedly believed that defendant had an affair with his girl friend, Torres, who was then pregnant with defendant's child. Ramos initially testified that after visiting defendant in jail, he and Torres went directly to Sanchez' home. Ramos explained the murder plot to Contes, and Torres interjected that the money would be paid since defendant is a "big time dope dealer." On cross-examination, it was revealed that Ramos had given a signed statement to the police. In that statement he failed to mention any comments allegedly made by Torres regarding the defendant being a "big time dope dealer." Thus, according to defendant, this is evidence of Ramos' lack of honesty.

On review, when faced with a challenge to the sufficiency of the evidence, the relevant inquiry for a court of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237.) This court is not permitted to substitute its judgment for that of the trier of fact on questions involving the weight to be assigned evidence or the credibility of witnesses. (*People v. Campbell* (1992), 146 Ill. 2d 363.) Accordingly, we will not disturb a conviction unless the evidence presented at trial is so "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt [citation]." *Campbell*, 146 Ill. 2d at 375.

■ After a careful review of the evidence presented at trial and the record on appeal, we conclude that there is more than sufficient evidence from which the jury could have concluded that defendant committed the acts with which he was charged. The jury found the

testimony of Ramos and numerous other witnesses reliable and chose to believe the State's interpretation of the facts. While defendant's version of the story is quite different, it is the jury's function to determine the credibility of witnesses and resolve conflicts. (*People v. Medeiros* (1993), 249 Ill. App. 3d 139, 141.) In the case *sub judice*, the evidence can in no way be said to be unreasonable, improbable or unsatisfactory and, accordingly, we find no reasonable doubt of defendant's guilt.

Defendant's final argument is that the trial court erred in refusing to allow the jury to view in the jury room Miguel Ramos' motion to suppress his own testimony and affidavit regarding his being beaten by the police.

The decision as to which evidentiary items should be taken into the jury room rests within the sound discretion of the trial court, whose decision will not be disturbed on review absent a showing of actual prejudice. *People v. Jones* (1988), 169 Ill. App. 3d 883.

Assuming, *arguendo*, that these documents should have been submitted to the jury, this was harmless error as defendant has failed to credibly demonstrate any prejudice he suffered as a result of this ruling. Moreover, even if we believed that the jury should have had this evidence with it during its deliberations, we are convinced that its verdict would not have changed.

For all of the foregoing reasons, the judgment of the Cook County circuit court is hereby affirmed in all respects.

Judgment affirmed.

RIZZI and CERDA, JJ., concur.